[788 NYS2d 314]

Arcenio Sanango, Respondent, v 200 East 16th Street Housing Corporation, Appellant and Third-Party Plaintiff-Appellant, et al., Defendant. Tower Building Restoration, Inc., Third-Party Defendant-Appellant, et al., Third-Party Defendant.

First Department, December 28, 2004

## APPEARANCES OF COUNSEL

*Mauro Goldberg & Lilling LLP*, Great Neck (*Kenneth Mauro* and *Jennifer B. Ettenger* of counsel), and *Thomas M. Bona*, White Plains, for 200 East 16th Street Housing Corporation, appellant.

*Mauro Goldberg & Lilling LLP*, Great Neck (*Kenneth Mauro* and *Jennifer B. Ettenger* of counsel), and *Marshall Conway & Wright, P.C.*, New York City, for Tower Building Restoration, Inc., appellant.

*Roura & Melamed*, New York City, and *Alexander J. Wulwick*, New York City, for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.

On July 2, 1998, plaintiff, an undocumented alien, sustained serious injuries when he fell 15 feet from a ladder while he was working as a laborer on a construction project. Thereafter, plaintiff commenced this Labor Law § 240 (1) action against 200 East 16th Street Housing Corporation (200 East), the owner of the work site, and 200 East commenced a third-party action for indemnification against Tower Building Restoration, Inc. (Tower), the contractor that had been plaintiff's employer. The instant appeal is taken by 200 East and Tower from a judgment that, based on a jury verdict, awards plaintiff substantial damages for his injuries. While the vast majority of the damages awarded to plaintiff are for pain and suffering ($2,452,000 before structuring pursuant to CPLR article 50-B), the judgment also grants plaintiff a recovery of $96,000 for lost earnings. This award is based on evidence that was presented to the jury, over objection, of the wages that plaintiff allegedly would have been able to earn in the United States but for his injuries.

Although we otherwise affirm plaintiff's judgment, we find that the appeal has merit insofar as it seeks reversal of the award for lost earnings. It is conceded that plaintiff is entitled, without regard to his immigration status, to recover damages for items such as pain and suffering and medical expenses. The

issue presented here, however, is whether, in light of the federal Immigration Reform and Control Act of 1986 (IRCA) (8 USC § 1324a *et seq.*, as added by Pub L 99-603, 100 US Stat 3359, as amended) and the recent decision of the United States Supreme Court in *Hoffman Plastic Compounds, Inc. v National Labor Relations Bd.* (535 US 137 [2002]), plaintiff's status as an undocumented alien bars or limits his recovery for lost earnings. As more fully discussed below, the clear implication of *Hoffman* is that a remedy based on the wages plaintiff might have earned unlawfully in the United States "would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA" (535 US at 151). Thus, we conclude that the motion by 200 East and Tower to exclude plaintiff's evidence on the issue of lost earnings should have been granted to the extent of limiting the evidence admissible on that issue to proof of the wages that, but for his injuries, plaintiff would have been able to earn in his country of origin. Accordingly, we vacate the award for lost earnings, and remand for a new trial, consistent with this opinion, solely on that issue.

Initially, we reject plaintiff's contention that 200 East and Tower failed to preserve the issue of the extent to which IRCA preempts the claim for lost earnings. The record reflects that, on July 24, 2002, just before the jury was sworn, the defense made a motion in limine to preclude the introduction of any evidence of lost earnings on two grounds, which were (1) that, under IRCA and *Hoffman* (*supra*), plaintiff, as an undocumented alien, was precluded from recovering such damages (the preemption argument), and (2) that plaintiff's anticipated testimonial evidence in support of the claim for lost wages was insufficient to support an award, due to the absence of any documentary corroboration (the sufficiency argument). The court did not immediately rule on any of the in limine motions, which were again brought up on the record after the jury was excused on July 31, 2002. At that time, defense counsel restated the grounds adduced in support of the motion to preclude evidence of loss of earnings. After referring to the preemption argument ("Does your Honor think that the U.S. Supreme Court case that we cited should be extended to lost income claims in civil tort cases?"), defense counsel stated, "However you [the court] rule on that is fine with us," and then went on to address the sufficiency argument. Thereafter, the court asked defense counsel, "So you see two issues?", to which defense counsel responded, "Yes." In subsequently denying the defense motion in limine,

the court expressly addressed and rejected the preemption argument.

Plaintiff's interpretation of defense counsel's "fine with us" statement as a withdrawal of the preemption argument is untenable. The statement is readily explained as an expression of the defense position that, even if the preemption argument were rejected, the lost earnings claim should be dismissed based on the sufficiency argument. Moreover, the subsequent colloquy between the court and defense counsel, clarifying that the defense motion in limine presented "two issues," as well as the court's ultimate express rejection of the preemption argument in denying the motion, plainly reflect that neither the court nor defense counsel understood the preemption argument to have been withdrawn. Accordingly, the preemption issue in this case is preserved.

Turning to the substance of the preemption issue, the starting point of our analysis is IRCA, which the Supreme Court described as follows in *Hoffman* (535 US at 147-148 [footnote omitted]):

> "In 1986, . . . Congress enacted IRCA, a comprehensive scheme prohibiting the employment of illegal aliens in the United States. § 101 (a) (1), 100 Stat. 3360, 8 U.S.C. § 1324a. As we have previously noted, IRCA 'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration law.' *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 US 183, 194, and n. 8 (1991). It did so by establishing an extensive 'employment verification system,' [8 USC] § 1324a (a) (1), designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States, § 1324a (h) (3). This verification system is critical to the IRCA regime. To enforce it, IRCA mandates that employers verify the identity and eligibility of all new hires by examining specified documents before they begin work. § 1324a (b). If an alien applicant is unable to present the required documentation, the unauthorized alien cannot be hired. § 1324a (a) (1).
>
> "Similarly, if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's

undocumented status. § 1324a (a) (2). Employers who violate IRCA are punished by civil fines, § 1324a (e) (4) (A), and may be subject to criminal prosecution, § 1324a (f) (1). IRCA also makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents. § 1324c (a). . . . Aliens who use or attempt to use such documents are subject to fines and criminal prosecution. 18 U.S.C. § 1546 (b). . . .

"Under the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies. Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations."

The question in *Hoffman* was whether, notwithstanding IRCA's strong policy against the employment of undocumented aliens, the National Labor Relations Board (NLRB) had discretion to award back pay to an undocumented alien as a remedy for the termination of his employment in violation of the National Labor Relations Act (NLRA).[1] The Supreme Court ruled that the NLRB had no discretion to fashion such a remedy because "awarding backpay to illegal aliens runs counter to policies underlying IRCA" (535 US at 149). The Court observed that "awarding backpay in a case like this not only trivializes the immigration laws, it also condones and encourages future violations" because, among other things, the alien "cannot mitigate damages, a duty our cases require, without triggering new IRCA violations" (*id.* at 150-151 [citations omitted]). The Court concluded that

"allowing the [NLRB] to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA. It would . . . condone prior violations of the immigration laws, and encourage future violations. However broad the [NLRB's] discretion to fashion remedies when dealing only

---

1.  The employer in *Hoffman*, without knowing of the alien's undocumented status, had terminated him, along with three other employees, "in order to rid itself of known union supporters" (535 US at 140).

with the NLRA, it is not so unbounded as to authorize this sort of an award." (535 US at 151-152.)

*Hoffman* involved IRCA's interplay with federal labor law, while this case involves IRCA's interplay with state tort law. Nonetheless, *Hoffman* has critical implications for this case, since an award of damages herein based on the United States wages plaintiff might have earned unlawfully, but for his injury, would "unduly trench upon" IRCA's federal immigration policy in substantially the same manner as did the NLRB back pay award in *Hoffman*. Like the *Hoffman* back pay award, a lost earnings award in this case would compensate an undocumented alien for the United States wages he could have earned only by "remain[ing] in the United States illegally, and continu[ing] to work illegally, all the while successfully evading apprehension by immigration authorities" (535 US at 149), thereby "condon-[ing] prior violations of the immigration laws" (*id.* at 151). Moreover, an award of damages for lost United States wages in this case would, like the *Hoffman* back pay award, encourage future IRCA violations, since mitigation of damages is a requirement under both federal labor law (*id.* at 150-151) and New York tort law (*see Murphy v Columbia Univ.*, 4 AD3d 200, 203-204 [2004], citing *McLaurin v Ryder Truck Rental*, 123 AD2d 671, 673 [1986]). We would add that if even a coequal federal statute, such as the NLRA, must, under some circumstances, give way to IRCA, as *Hoffman* holds, it follows that a state law—which, by virtue of the Supremacy Clause (US Const art VI [2]), is subordinate to any federal policy—must give way to IRCA, as well.

Although we previously have held it permissible for the administrator of an undocumented alien's estate to recover wages the decedent might have earned in the United States (*Public Adm'r of Bronx County v Equitable Life Assur. Socy. of U.S.*, 192 AD2d 325 [1993]), we find this holding no longer tenable after *Hoffman*. To reiterate, *Hoffman* establishes that an award of compensation for wages that an alien, but for some violation of his rights, would have earned illegally in the United States "runs counter to," and "unduly trench[es] upon," the federal immigration policies embodied in IRCA (535 US at 149, 151). Stated otherwise, any such award—including the lost earnings damages at issue here—would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress [in enacting IRCA]" (*Geier v American Honda Motor Co., Inc.*, 529 US 861, 873 [2000], quoting *Hines v*

*Davidowitz*, 312 US 52, 67 [1941]; *see also Drattel v Toyota Motor Corp.*, 92 NY2d 35, 43 [1998] [overruled on other grounds by *Geier, supra*]). Since a state law that so "frustrate[s] the accomplishment of a federal objective" (*Geier*, 529 US at 873) is preempted by virtue of the Supremacy Clause, it follows ineluctably from *Hoffman* that New York law, to the extent it would permit plaintiff to recover the wages he would have earned illegally in the United States, is preempted by IRCA.[2]

*Hoffman* compels the conclusion that plaintiff cannot recover lost United States wages he might have unlawfully earned, had he not been injured, whether it was Tower (by hiring plaintiff without requesting documentation of his right to work) or plaintiff himself (by tendering false documents to Tower) who committed the IRCA violation that resulted in the unlawful employment. In this regard, we believe that plaintiff's acceptance of unlawful employment should be deemed to constitute misconduct contravening IRCA's policies whether or not he submitted false documents so as to expose himself to potential criminal liability.

We note that the dissent in *Balbuena v IDR Realty LLC* (13 AD3d 285, 286 [2004])—a case that raises substantially the same issue we address here—would permit an undocumented alien to recover lost United States wages as an element of tort damages. In support of this view, the *Balbuena* dissent argues that limiting an undocumented alien's ability to recover lost earnings in a tort case will, in many cases, incidentally benefit an employer that has committed an IRCA violation, thereby creating an incentive to such unlawful hiring.[3] While we recognize the validity of this concern, we do not believe the objection

---

**2.** We note that the Supreme Court, Richmond County, recently reached a similar conclusion in *Majlinger v Cassino Contr. Corp.* (1 Misc 3d 659 [2003]; *accord Veliz v Rental Serv. Corp. USA, Inc.*, 313 F Supp 2d 1317, 1334-1337 [MD Fla 2003]; *Hernandez-Cortez v Hernandez*, 2003 WL 22519678,*5-7, 2003 US Dist LEXIS 19780, *15-19 [D Kan, Nov. 4, 2003]; *see also Crespo v Evergo Corp.*, 366 NJ Super 391, 841 A2d 471 [2004], *cert denied* 180 NJ 151, 849 A2d 184 [2004] [undocumented alien, whom employer did not permit to return to work after maternity leave in violation of New Jersey's anti-discrimination statute, could not recover damages for such unlawful termination in light of *Hoffman*]). We recognize that there is also nonbinding authority to the contrary, but, for the reasons discussed in this opinion, we respectfully disagree with those decisions.

**3.** The record before us does not reveal whether Tower committed any violation of IRCA, either by hiring plaintiff without asking him to provide documentation of his right to work in the United States, or by continuing to employ him after discovering his undocumented status.

can withstand scrutiny. To begin, the potential limitation of one item of damages (lost earnings) in a future tort action is such a remote and uncertain benefit that it would not constitute a real incentive to the employment of undocumented aliens. The entirely theoretical nature of this supposed incentive to unlawful hiring is underscored by the fact that employers generally purchase insurance coverage for any kind of tort liability that commonly arises in the ordinary course of their business. Furthermore, any incentive to violate IRCA is negated by the exposure to civil and criminal penalties that an employer incurs by committing such a violation. In sum, just as the potential for recovering lost United States wages in a future workplace personal injury action is (in the *Balbuena* dissent's words) "unlikely to influence an immigrant's decision to try to secure work in this country" (*id.* at 288), the potential for limiting lost earnings damages (frequently, as here, a small proportion of total damages) to the wages of an undocumented worker's home country is unlikely to influence employers' hiring behavior.

The *Balbuena* dissent also asserts that "the punishment of the undocumented worker, to the advantage of the employer who has violated the IRCA, contravenes the statute's purpose and intent." (*Id.* at 286.) This statement is incorrect to the extent it is meant to suggest that IRCA criminalizes only the conduct of those who employ undocumented aliens. As noted in *Hoffman* (535 US at 148), section 1324c (a) of IRCA "makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents," and "[a]liens who use or attempt to use such documents are subject to fines and criminal prosecution" under 18 USC § 1546 (b). Further, *Hoffman* demonstrates that, in some cases, IRCA may require a result that incidentally benefits the employer of an undocumented alien (and, again, the employer of an undocumented alien is not necessarily the party that has violated the statute). In any event, we reject the *Balbuena* dissent's contention that giving effect to IRCA, as construed by *Hoffman*, to the extent of limiting plaintiff's lost earnings damages to lost foreign wages, constitutes "punishment of the undocumented worker." (13 AD3d at 286.) Our holding merely limits plaintiff's recovery to the wages that, but for his injuries, he could have earned *lawfully*. We are not aware of any other context in which a person who has derived income from an illegal activity is permitted, after a personal injury forces him to abandon that activity, to recover damages based on the lost stream of illegal income through judicial proceedings in a court of law.

Whatever the validity of the arguments made by the *Balbuena* dissent, *Hoffman* authoritatively establishes that it subverts federal immigration policy to compensate an undocumented alien for wages that, but for some violation of his rights, he might have earned illegally in the United States. This is the fundamental point on which the *Balbuena* dissent goes astray. Whether or not we agree with *Hoffman*'s reasoning, we are bound by its conclusion that federal immigration policy is offended by an award compensating an undocumented alien for lost illegal wages.[4] If, as held by *Hoffman*, an award of such compensation interferes with IRCA when rendered as a remedy for a violation of the NLRA, then, logically, an award of such compensation also interferes with IRCA when rendered as a tort remedy under state law. Understandably, the *Balbuena* dissent does not explain how it could be that federal immigration policy, even though subverted by an award of compensation for lost illegal wages in the former case, is not subverted by an award of the same kind of compensation in the latter case. Since this issue of federal concern has already been resolved by the United States Supreme Court, the *Balbuena* dissent's discussion of IRCA's legislative history and of various policy considerations, however cogent that discussion may be, is beside the point.

For the foregoing reasons, we conclude that state tort law, to the extent it permits an undocumented alien to recover compensation for lost illegal wages as an element of damages, is preempted by IRCA pursuant to the Supremacy Clause of the United States Constitution. We are unaware, however, of any federal policy that would be offended by awarding an undocumented alien damages for lost earnings based on the prevailing wage in the alien's country of origin. Therefore, while we vacate plaintiff's existing award for lost earnings, we remand for a new trial to afford plaintiff an opportunity to prove the wages that, but for his injuries, he would have been able to earn in his home country.[5]

---

**4.** In this regard, we note that, in deciding *Hoffman*, the Supreme Court majority was clearly aware of, and rejected, the incentive-to-illegal-hiring argument made by the *Balbuena* dissent, since the *Hoffman* dissent made precisely the same argument (*see* 535 US at 155-156 [Breyer, J., dissenting]).

**5.** Should the parties choose to address the issue of mitigation of lost earnings at the new trial, we note that the evidence admissible on that issue will be limited to proof of the employment opportunities available to plaintiff, and of plaintiff's mitigation efforts, in his home country.

Finally, the judgment is affirmed in all other respects. The weight of the evidence supports the jury's findings that plaintiff suffers significant limitations of mobility and continual pain; that his prognosis is poor, and additional surgery may be required; and that the separation of a pedicle screw inserted during a spinal fusion procedure presents the risk of further injury due to migration of the fragment. Moreover, because of the fragment's location, surgery to repair plaintiff's torn rotator cuff is contraindicated. Under the circumstances, the awards for past and future pain and suffering do not deviate materially from what is reasonable compensation (*cf. Barrowman v Niagara Mohawk Power Corp.*, 252 AD2d 946, 948 [1998], *lv denied* 92 NY2d 817 [1998]).

Accordingly, the judgment of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered October 17, 2002, which, insofar as appealed from as limited by the briefs, awarded plaintiff, after a jury trial, $1,000,000 for past pain and suffering, $1,452,000 for future pain and suffering over a period of 29.2 years, $48,000 for past lost earnings, and $48,000 for future lost earnings over a period of 29.2 years, with the awards for future damages being structured in part pursuant to CPLR article 50-B, should be modified, on the law, to vacate the awards for past and future lost earnings, the matter remanded for a new trial on the issue of past and future lost earnings measured by the wages prevailing in plaintiff's country of origin, and otherwise affirmed, without costs.

NARDELLI, J.P., SAXE and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, entered October 17, 2002, modified, on the law, to vacate the awards for past and future lost earnings, the matter remanded for a new trial on the issue of past and future lost earnings measured by the wages prevailing in plaintiff's country of origin, and otherwise affirmed, without costs.