Stanislaw Majlinger, Appellant, v Cassino Contracting Corp. et al., Respondents, and Jack Thaon et al., Defendants and Third-Party Plaintiffs-Respondents, et al., Defendants. Alum-A-Pole Corp., Third-Party Defendant-Respondent. Eliot Spitzer, as Attorney General of the State of New York, Intervenor.

Second Department, September 19, 2005

## APPEARANCES OF COUNSEL

*Cardali & Cardali, P.C.*, New York City, and *Pollack, Pollack, Isaac & DeCicco* (*Raymond C. Silverman* and *Brian J. Isaac* of counsel), for appellant.

*Smith & Laquercia, LLP*, New York City (*Reed M. Podell* and *Edwin L. Smith* of counsel), for Cassino Contracting Corp. and another, respondents.

*DeCicco Gibbons & McNamara, P.C.*, New York City, and *Mischel & Horn, P.C.* (*Scott T. Horn* of counsel), for Jack Thaon and others, defendants and third-party plaintiffs-respondents.

*Jacobson & Schwartz*, Rockville Centre (*Henry J. Cernitz* of counsel), for D & Sons Construction Corp., respondent.

*Eliot Spitzer, Attorney General*, New York City (*Michael S. Belohlavek, M. Patricia Smith, Donya Fernandez*, and *Seth Kupferberg* of counsel), intervenor pro se.

## OPINION OF THE COURT

PRUDENTI, P.J.

This appeal requires us to decide whether a New York court's award of damages for lost wages to an undocumented alien injured in a workplace accident is preempted by federal immigration policy. We hold that an employer, general contractor, or property owner whose negligence or violation of New York's workplace safety statutes causes injury to a worker may not avoid liability for the worker's lost wages by virtue of the worker's status as an undocumented alien. Such a rule is not only compatible with, but furthers, Congress's policy of deterring the hiring of undocumented aliens.

The plaintiff, Stanislaw Majlinger, allegedly was injured in January 2001, when he fell from a scaffold while installing siding as an employee of J & C Home Improvement (hereinafter J & C). The plaintiff commenced this action against various entities alleged to be property owners, general contractors, or their agents at the site of the accident. J & C was not named as a defendant, either in the plaintiff's action or in the third-party ac-

tion brought by three of the defendants. The complaint alleged common-law negligence and violations of Labor Law §§ 200, 240 and 241 (6). In his bill of particulars, the plaintiff asserted that as a result of his injuries he was incapacitated from employment and he was seeking, inter alia, damages for lost earnings.

The plaintiff immigrated to the United States from Poland in November 2000. He testified at his deposition that he was not aware of his immigration status, but he acknowledged that he did not have a Social Security number. By counsel, he disclosed that he was in the United States on an extension of his original tourist visa. In response to a discovery demand made by the defendants Cassino Contracting Corp. (hereinafter Cassino) and Veteran Properties, Inc. (hereinafter Veteran), and enforced by the Supreme Court, the plaintiff acknowledged that he was not in possession of any of the documents enumerated in the federal immigration statutes and regulations (*see* 8 USC § 1324a [b] [1] [B], [C], [D]; 8 CFR 274a.2 [b] [1] [v]) that would demonstrate his eligibility for employment in the United States.

Cassino and Veteran moved for summary judgment dismissing the plaintiff's lost wages claim on the ground that the plaintiff, as an undocumented alien, was not entitled to recover "unearned past and future lost wages in a personal injury action," pursuant to the Immigration Reform and Control Act of 1986 (8 USC § 1324a *et seq.* [hereinafter the IRCA]), as interpreted by the United States Supreme Court in *Hoffman Plastic Compounds, Inc. v NLRB* (535 US 137 [2002]). Cassino and Veteran argued that the plaintiff "cannot be awarded wages that the IRCA prohibits him from earning." The defendants and third-party plaintiffs, Jack Thaon, Celebration, LLC, and New York City Partnership Housing Development Fund Company, the defendant D & Sons Construction Corp., and the third-party defendant separately moved for the same relief.

The Supreme Court granted the motions and, "[o]n constraint of *Hoffman*," dismissed the claim for lost wages (*Majlinger v Cassino Contr. Corp.*, 1 Misc 3d 659, 662 [2003]). The court reasoned that "sanction[ing] the recovery of lost wages by an undocumented alien for work not performed would run contrary to both the letter and spirit of the IRCA" (*id.*). The plaintiff appeals.

The Immigration and Nationality Act (8 USC § 1101 *et seq.* [hereinafter the INA]), inter alia, criminalizes unsanctioned entry into the United States by an alien (*see* 8 USC § 1325) and provides that any alien who was inadmissible upon entering the

United States is deportable (*see* 8 USC § 1227 [a] [1] [A]). Prior to 1986, the INA evinced "at best . . . a peripheral concern with employment of illegal entrants" (*De Canas v Bica*, 424 US 351, 360 [1976]). The INA did not "mak[e] it unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization," and did not "ma[k]e it a separate criminal offense for an alien to accept employment after entering this country illegally" (*Sure-Tan, Inc. v NLRB*, 467 US 883, 892-893 [1984]).

In 1986 Congress enacted the IRCA, which makes it unlawful to employ any alien who is not authorized to work in the United States (*see* 8 USC § 1324a [a]). A House Judiciary Committee report accompanying the IRCA explained that "[e]mployment is the magnet that attracts aliens here illegally," and that the statute's primary purpose was to prevent the employment of undocumented aliens by placing the onus on employers to verify their prospective employees' eligibility to work in the United States (HR Rep No. 99-682[I], 99th Cong, 2d Sess, at 45, 46, reprinted in 1986 US Code Cong & Admin News, at 5649, 5650 ["This legislation seeks to close the back door on illegal immigration . . . . The principal means of (doing so) is through employer sanctions," which is "the most humane, credible and effective way to respond to the large-scale influx of undocumented aliens"]). Accordingly, the IRCA requires that every employer, before hiring any person, verify that the person is not an unauthorized alien by examining documents that establish the person's identity and eligibility for employment in the United States (*see* 8 USC § 1324a [b]). The IRCA establishes civil and criminal penalties for employers who violate the statute (*see* 8 USC § 1324a [e], [f]). The IRCA also makes it unlawful to submit false or fraudulent documents to a prospective employer in order to satisfy the verification requirements (*see* 8 USC § 1324c [a]), and an individual who does so is subject to criminal prosecution (*see* 18 USC § 1546 [b]).

In two cases decided after the enactment of the IRCA, this Court and the Appellate Division, First Department, rejected arguments that the plaintiffs in wrongful death actions should be precluded from recovering the lost wages of alien decedents unlawfully employed in the United States (*see Collins v New York City Health & Hosps. Corp.*, 201 AD2d 447 [1994]; *Public Adm'r of Bronx County v Equitable Life Assur. Socy.*, 192 AD2d 325 [1993]). In *Collins*, we held that "the record fails to establish as a matter of law that any wages which the decedent might

have earned would have been the product of illegal activity. Rather, this question, as well as the length of time during which the decedent might have continued earning wages in the United States, and the likelihood of his potential deportation, are factual issues for resolution by the jury under all of the circumstances of the case as developed by a full trial" (*Collins v New York City Health & Hosps. Corp., supra* at 448 [citations omitted]). The Court in *Public Adm'r of Bronx County* permitted the recovery of lost wages since the record in that case did not "support a conclusion, as a matter of law, that decedent's allegedly illegal conduct amounted to serious crimes that directly caused his injuries" (*Public Adm'r of Bronx County v Equitable Life Assur. Socy., supra* at 326).

In 2002 the United States Supreme Court decided *Hoffman Plastic Compounds, Inc. v NLRB* (535 US 137 [2002]). In that case, the employee, a native of Mexico who had never been legally admitted to, or authorized to work in, the United States, was hired by the employer after fraudulently presenting the birth certificate of an American-born friend. The employer laid off the employee, and the National Labor Relations Board (hereinafter the NLRB) later determined that the employer had terminated the employee and three other workers "in order to rid itself of known union supporters" in violation of the National Labor Relations Act (hereinafter the NLRA) (*id.* at 140). To remedy that violation, the NLRB ordered the employer, inter alia, to offer reinstatement and back pay to the employee.

The Supreme Court held that the NLRB lacked the discretion to award back pay to the employee for a period during which he was an alien unauthorized to work in the United States. The Court noted that in a decision predating the IRCA, it had held that the NLRA applied to undocumented aliens and that such an application of the statute did not conflict with then-existing federal immigration laws (*see Sure-Tan, Inc. v NLRB*, 467 US 883 [1984]). Indeed, the Court noted in *Sure-Tan* that the purposes of the immigration laws would be well served by extending the protection of the NLRA to undocumented aliens, because "[i]f an employer realizes that there will be no advantage under the NLRA in preferring illegal aliens to legal resident workers, any incentive to hire such illegal aliens is correspondingly lessened" (*id.* at 893). The *Sure-Tan* court held, however, that in devising a remedy for the NLRA violations suffered by the employees in that case, who had returned to Mexico after being discharged, the NLRB was "obliged to take into ac-

count [the] equally important Congressional objectiv[e] . . . of deterring unauthorized immigration" (*id.* at 903 [internal quotation marks omitted]). Thus, the Court concluded that reinstatement "must be conditioned upon the employees' legal readmittance to the United States," and the accrual of back pay must be tolled "during any period when they were not lawfully entitled to be present and employed in the United States" (*id.*).

In *Hoffman,* the Court explained that the IRCA, "a comprehensive scheme prohibiting the employment of illegal aliens in the United States," had "significantly changed" the "legal landscape" (*Hoffman Plastic Compounds, Inc. v NLRB, supra* at 147). The Court held that an award of back pay to an alien for a period during which his employment in the United States was prohibited by the IRCA was impermissible. The Court reasoned that:

> "Under the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies. Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations. The [NLRB] asks that we overlook this fact and allow it to award back pay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud. We find, however, that awarding back pay to illegal aliens runs counter to policies underlying IRCA, policies the [NLRB] has no authority to enforce or administer. Therefore, as we have consistently held in like circumstances, the award lies beyond the bounds of the [NLRB's] remedial discretion. . . .

> "[A]llowing the [NLRB] to award back pay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations" (*id.* at 148-149, 151).

In a recent pair of decisions, the Appellate Division, First Department, held that, in light of *Hoffman,* an undocumented alien may not be awarded lost earnings in a personal injury action based on wages he would have earned in the United States (*see Sanango v 200 E. 16th St. Hous. Corp.,* 15 AD3d 36 [2004]; *Balbuena v IDR Realty LLC,* 13 AD3d 285 [2004], *adhered to on rearg and lv granted,* App Div, 1st Dept, May 24, 2005). The Court reasoned that "an award of damages herein based on the United States wages plaintiff might have earned unlawfully, but for his injury, would 'unduly trench upon' IRCA's federal immigration policy in substantially the same manner as did the NLRB back pay award in *Hoffman*" (*Sanango v 200 E. 16th St. Hous. Corp., supra* at 41). Accordingly, the Court concluded that its holding in *Public Adm'r of Bronx County v Equitable Life Assur. Socy.* (*supra*) was "no longer tenable after *Hoffman*" (*Sanango v 200 E. 16th St. Hous. Corp., supra* at 41). In *Balbuena,* Justice Ellerin dissented, expressing the view that awarding damages in state tort cases for wages that undocumented aliens could have earned in the United States "would not have any significant impact upon the IRCA's objectives of 'prohibiting' their employment," and therefore such awards are not preempted by the IRCA (*Balbuena v IDR Realty LLC, supra* at 288 [Ellerin, J., dissenting]).

The defendants in this case contend that the plaintiff, as an undocumented alien, is not entitled to recover lost wages because such a remedy is preempted by federal immigration policy, as expressed in the IRCA and the *Hoffman* decision. When Congress enacts a statute "touching the rights, privileges, obligations or burdens of aliens as such . . . the . . . statute is the supreme law of the land" (*Hines v Davidowitz,* 312 US 52, 63 [1941]; *see* US Const, art I, § 8 [4]; *Nyquist v Mauclet,* 432 US 1, 10 [1977] ["Control over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere"]). Under the Supremacy Clause (US Const, art VI, § 2), Congress is empowered to preempt state law. "In the absence of explicit statutory language signaling an intent to pre-empt [a court may] infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation . . . or where the state law at issue conflicts with federal law" (*Northwest Central Pipeline Corp. v State Corporation Comm'n of Kan.,* 489 US 493, 509 [1989] [citation omitted]). Such a conflict arises where it is physically impossible to comply with both the federal and state laws (*see Florida*

*Lime & Avocado Growers, Inc. v Paul*, 373 US 132, 142-143 [1963]) or where, "under the circumstances of this particular case, [the state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (*Geier v American Honda Motor Co.*, 529 US 861, 873 [2000], quoting *Hines v Davidowitz, supra* at 67). There exists, however, "a strong presumption against federal preemption of state and local legislation" (*Richmond Boro Gun Club, Inc. v City of New York*, 97 F3d 681, 687 [1996]), particularly when that legislation regulates "matters related to health and safety" (*Hillsborough County v Automated Medical Laboratories, Inc.*, 471 US 707, 715 [1985]). "[A] claim traditionally within the domain of State law will not be superseded by Federal law 'unless that was the clear and manifest purpose of Congress'" (*Nealy v US Healthcare HMO*, 93 NY2d 209, 217 [1999], quoting *New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co.*, 514 US 645, 655 [1995] [internal quotation marks omitted]; *see Medtronic, Inc. v Lohr*, 518 US 470, 485 [1996]).

Clearly, Congress has neither expressly preempted awards of lost wages to undocumented aliens in state-court personal injury actions nor entirely occupied the fields of workplace safety and common-law torts. Thus, the principal question presented in this case is whether an award of lost wages to an undocumented alien presents an obstacle to the Congressional objectives underlying the IRCA.

The IRCA, as construed by the *Hoffman* court, "forcefully made combating the employment of illegal aliens central to [t]he policy of immigration law" (*Hoffman Plastic Compounds, Inc. v NLRB, supra* at 147 [internal quotation marks omitted]), and the Supreme Court determined that the objectives of the IRCA outweighed Congress's policy choices in the area of labor relations, to the extent of precluding the NLRB's award of back pay to an employee who had obtained the employment at which he sought fair treatment by criminally subverting the IRCA's enforcement mechanism. There is no indication in the IRCA, however, that Congress intended to deprive undocumented aliens of their right to sue for personal injuries in state courts or to deprive them of the incidents thereof, such as the right to recover damages for lost wages.

To the contrary, a federal statute enacted in 1885 (Act of February 26, 1885, ch 164, § 2, 23 US Stat 332), which provided that any contract of employment with an undocumented alien

was void, was repealed in 1952 with the passage of the INA (*see* Immigration and Nationality Act § 403 [a] [2], 66 US Stat 163, 279). The INA, with certain exceptions, makes undocumented aliens who seek to enter this country for the purpose of performing labor ineligible to receive visas or to be admitted into the United States (*see* 8 USC § 1182 [a] [5]). This alteration of the federal statute indicates that "Congress determined that the exclusion of certain aliens from admission to the United States was a more satisfactory sanction than rendering their contracts void and thus unjustifiably enriching employers of such alien laborers" (*Gates v Rivers Constr. Co., Inc.*, 515 P2d 1020, 1023 [Alaska 1973]; *see Peterson v Neme*, 222 Va 477, 481, 281 SE2d 869, 871 [1981] ["Although Congress . . . might have criminalized an illegal alien's acceptance of employment, or declared any employment contract into which he entered unenforceable, or required forfeiture of any wages collected under such a contract, Congress did none of these"]). While the IRCA subsequently added provisions prohibiting the hiring of undocumented aliens, the IRCA and the regulations that accompany it "do not purport to intrude into the area of what protections a State may afford these aliens" (*Continental PET Tech., Inc. v Palacias*, 269 Ga App 561, 562-563, 604 SE2d 627, 630 [2004]; *see Correa v Waymouth Farms, Inc.*, 664 NW2d 324, 329 [Minn 2003] ["the IRCA was not intended to preclude the authority of states to award workers' compensation benefits to unauthorized aliens"]; HR Rep No. 99-682[I], 99th Cong, 2d Sess, at 45, 58, reprinted in 1986 US Code Cong & Admin News, at 5649, 5662 [IRCA was not intended "to undermine or diminish in any way labor protections in existing law, or to limit the powers of federal or state labor relations boards . . . to remedy unfair practices committed against undocumented employees"]). In the absence of an explicit statement of Congress's intent to deprive undocumented aliens of remedies to which they would otherwise be entitled in state courts, such a disability may not be inferred (*see Fairfax's Devisee v Hunter's Lessee*, 7 Cranch [11 US] 603, 622, 624-625 [1812]; *Janusis v Long*, 284 Mass 403, 406, 188 NE 228, 230 [1933]). Nor did the Supreme Court give any indication in *Hoffman* that undocumented aliens should be deprived of lost wages in state-court personal injury actions (*see Continental PET Tech., Inc. v Palacias, supra,* 269 Ga App at 564, 604 SE2d at 631 ["under *Hoffman,* labor protections other than back pay are available to illegal aliens"]; *Tyson Foods, Inc. v Guzman*, 116 SW3d 233, 244 [Tex Ct App 2003] [*Hoffman*

holding "only applies to an undocumented alien worker's remedy for an employer's violation of the NLRA and does not apply to common-law personal injury damages"]).

In *Sanango v 200 E. 16th St. Hous. Corp.* (15 AD3d 36 [2004]), the First Department concluded that there was no meaningful distinction between the award of back pay in *Hoffman* and an award of lost wages to an undocumented alien in a state-court personal injury action (*id.* at 41, 44). In our view, the First Department's interpretation of the *Hoffman* decision is unduly broad. While the Supreme Court's statement in *Hoffman* that "awarding backpay to illegal aliens runs counter to policies underlying IRCA" (*Hoffman Plastic Compounds, Inc. v NLRB*, 535 US at 149), if read expansively and out of context, would require the denial of lost wages to undocumented aliens, it would also compel the conclusion that *any* sort of employment-related payment to an undocumented alien violates federal immigration policy.[1] Such a rule would prevent an undocumented alien injured in the workplace from recovering, inter alia, workers' compensation benefits and damages for pain and suffering, and might ultimately require overruling decisions confirming the right of an undocumented alien to commence an action in a New York court in the first instance (*see e.g. Mazur v Rock-McGraw, Inc.*, 246 AD2d 515 [1998]; *Alvarez v Sanchez*, 105 AD2d 1114 [1984]; *Nizamuddowlah v Bengal Cabaret, Inc.*, 69 AD2d 875 [1979]; *Woo Sung Ling v City of New York*, 276 App Div 1026 [1950]; *Catalanotto v Palazzolo*, 46 Misc 2d 381, 383-384 [1965]). As a result, employers of undocumented aliens

---

1. The *Hoffman* court noted that the back pay award in that case compensated the employee for, inter alia, "years of work not performed" (*Hoffman Plastic Compounds, Inc. v NLRB, supra* at 149), and some courts have found that *Hoffman's* applicability depends, at least to some extent, on whether the employee is seeking compensation for work already performed or for work that has not been performed (*see Hernandez-Cortez v Hernandez*, 2003 WL 22519678, \*6, 2003 US Dist LEXIS 19780, \*17 [2003]; *Flores v Amigon*, 233 F Supp 2d 462, 463-464 [2002] [citing additional cases]). In our view, that distinction is meaningless for purposes of determining whether a particular remedy contravenes federal immigration policy. Undocumented workers who immigrate to this country are motivated by the prospect of earning wages, not the prospect of being awarded back pay as a result of an illegal termination or lost wages as a result of an injury (*see Dowling v Slotnik*, 244 Conn 781, 796, 712 A2d 396, 404 [1998], *cert denied sub nom. Slotnik v Considine*, 525 US 1017 [1998]; *Peterson v Neme*, 222 Va 477, 482, 281 SE2d 869, 872 [1981]; *Patel v Quality Inn S.*, 846 F2d 700, 704 [1988]; *Montoya v Gateway Ins. Co.*, 168 NJ Super 100, 104, 401 A2d 1102, 1104 [1979]). Thus, an employee's IRCA violation is no more "condoned" or "encouraged" by an award of back pay or lost future wages than by the routine payment of wages for work already performed.

would be free to ignore New York law governing workplace safety, labor relations, and the furnishing of workers' compensation coverage, to retaliate against workers who asserted any of their rights by reporting them to federal immigration authorities, to intimidate them by threatening to do so and, indeed, to withhold wages from employees altogether, with impunity.

In short, once *Hoffman* is construed broadly enough to apply to awards of lost wages in state-court personal injury actions, there may be nothing to prevent it from reaching so far as to eliminate all rights and protections to which undocumented aliens would otherwise be entitled (*see Local 512, Warehouse & Off. Workers' Union v National Labor Relations Bd.*, 795 F2d 705, 717-718, 718 n12 [1986] [collecting cases]), including the right to receive any compensation at all for their work (*see Martinez v Fox Val. Bus Lines*, 17 F Supp 576, 577 [1936] [rejecting personal injury defendant's position that if an alien is unlawfully present in the United States, "he may be despoiled of his property, contracts with him may be breached, that he may be unlawfully assaulted and injured, and that he is without redress"]; *Janusis v Long, supra,* 284 Mass at 408, 188 NE at 230 ["Even an unlicensed dog is not an outlaw and is entitled to some rights"]). Such a result would wreak havoc on well-established legal principles, including the right of aliens to equal protection of the laws (*see* US Const Amend XIV; *Plyler v Doe*, 457 US 202 [1982]; *Nizamuddowlah v Bengal Cabaret, Inc.*, 92 Misc 2d 220, 223 [1977], *affd* 69 AD2d 875 [1979]; *Dezsofi v Jacoby*, 178 Misc 851, 855 [1942]), and may even implicate the constitutional prohibition of involuntary servitude (*see* US Const Amend XIII; *United States v Kozminski*, 487 US 931, 948 [1988] ["it is possible that threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude"]). Accordingly, we believe that the holding of *Hoffman* must be construed narrowly.

As between an undocumented worker and the federal government, the act of submitting fraudulent documents in order to secure employment is unlawful (*see* 8 USC § 1324c [a]). As between the employer and the federal government, the act of hiring an undocumented worker knowingly or without verifying his or her employment eligibility is unlawful (*see* 8 USC § 1324a [a] [1]). As between the undocumented worker and the employer, however, there is a contract of employment, under which the worker is entitled to be paid for his or her work. Moreover, as between the worker and an alleged tortfeasor, there are duties

under the common law and the New York statutes governing workplace safety (*see* Labor Law § 240 [1]; § 241 [6]). The contractual, statutory, and common-law duties owed to the worker are unrelated to, and do not depend on, the worker's compliance with federal immigration laws (*see Mendoza v Monmouth Recycling Corp.*, 288 NJ Super 240, 247, 672 A2d 221, 224-225 [1996]; *Janusis v Long, supra,* 284 Mass at 408, 188 NE at 231).

While the duties imposed on employers, property owners, and general contractors do serve important public policy interests, the enforcement of those duties through a personal injury action is ultimately a private matter between the parties, adjudicated by a court (*cf. Rivera v Nibco, Inc.*, 364 F3d 1057, 1067 [2004], *cert denied* 544 US 905 [2005] [it is "unlikely" that *Hoffman* applies in discrimination actions under title VII of the Civil Rights Act of 1964 because, inter alia, title VII, unlike the NLRA, "depends principally upon private causes of action for enforcement"]; *Montoya v Gateway Ins. Co.*, 168 NJ Super 100, 108, 401 A2d 1102, 1105-1106 [1979] [court's enforcement of private contract between insurer and undocumented alien would not have effect of "subsidizing" or "aiding" alien's continued illegal presence in this country]). The award of back pay in *Hoffman,* by contrast, was made by an executive-branch agency, and its primary purpose was to further federal public policy against unfair labor practices, which, in the *Hoffman* court's view, conflicted with the separate federal policy on immigration (*cf. Rivera v Nibco, Inc., supra* at 1068, 1068 n 11 [it is "unlikely" that *Hoffman* applies in discrimination actions under title VII because, inter alia, the *Hoffman* decision focused extensively on the NLRB's "limited power to construe statutes outside of its authority," while "(u)nder Title VII, a federal court decides whether a statutory violation warrants a backpay award," and courts have power to interpret both title VII and the IRCA]; *Hernandez v M/V Rajaan*, 848 F2d 498, 500 [1988], *cert denied* 488 US 981, 1030 [1988] [pre-*Hoffman* decision holding that undocumented alien plaintiff was eligible to recover lost future wages at United States rates; "At the time of the accident, (the employer) was accepting (the plaintiff's) labors . . . without regard to the status of his citizenship. As a private citizen, (the employer's) relationship to (the plaintiff) is not the same as the plaintiffs' relationship with their employer in *Sure-Tan,* in which a back-pay remedy applied by the (NLRB) was found to implicate labor policy considerations"]).

In *Hoffman*, the Supreme Court viewed the award of back pay as a reward for the employee's flagrant violation of the IRCA's antifraud provision, concluding that such a remedy, under the circumstances of that case, would trivialize the immigration laws, condone past IRCA violations, and encourage future violations (*see Hoffman Plastic Compounds, Inc. v NLRB, supra* at 150-151). An award of lost wages, however, compensates the employee for a loss of income proximately caused by the defendant's injury-producing negligence. Although the plaintiff is not presently authorized to work in the United States, such damages are no more a reward for illegal conduct than are the wages the plaintiff has earned in this country, and no party in this case argues, and no court has held, that an undocumented alien may be deprived of wages for work already performed.[2] In personal injury actions commenced in the courts of this state, the recovery of damages for lost wages is normal and represents the status quo. Thus, withholding that remedy from the plaintiff would operate as a penalty against him, based on his status as an undocumented alien. While state courts may not award damages that would interfere with or frustrate federal immigration policy, it is not appropriate for them to augment that policy by imposing upon undocumented aliens an additional penalty not authorized by federal law (*see Martinez v Fox Val. Bus Lines, supra* at 577).

Moreover, although the employer in *Hoffman* terminated the employee based on an improper motivation, i.e., ridding itself of union supporters, the employer unwittingly had a valid reason for taking precisely the action it took, i.e., the employee's lack of authorization to work in this country, which had been concealed from the employer by the employee's fraudulent conduct (*see* 8 USC § 1324a [a] [2] [employer may not continue to employ alien knowing that alien is not authorized to work in United States]). Thus, there was no real injustice in denying the employee back pay. Here, by contrast, the defendants had no right to withhold the safety devices required under Labor Law § 240 (1), and that alleged wrongful conduct deprived the plaintiff of his capacity to earn wages. Although the federal immigration authorities could have effected the same result (with respect to

---

**2.** At least one court has recognized that "in the end, the right to workers' compensation is as much an incident of the employment as the right to receive salary, and has been earned once the labor has been performed" (*Mendoza v Monmouth Recycling Corp., supra*, 288 NJ Super at 248, 672 A2d at 225). The same reasoning arguably applies to the wages that the plaintiff would have continued to earn but for his injury.

wages at United States rates) by deporting the plaintiff, the defendants had no ability or authority to do so.

Thus, we conclude that the holding of *Hoffman* is not so broad as to require a ruling that a New York court's award of lost wages to an undocumented alien is preempted by the IRCA or the policy underlying it. Furthermore, our own analysis of the preemption issue leaves us firmly convinced that requiring defendants to pay the same damages to all plaintiffs regardless of their immigration status not only does not interfere with, but actually advances, the immigration policy of the United States, as reflected in the applicable federal statutes. In our judgment— and in the judgment of many other courts,[3] including the United States Supreme Court (*see Sure-Tan, Inc. v NLRB, supra* at 893-894)—withholding otherwise available remedies from undocumented aliens would create an incentive for unscrupulous employers to hire them, secure in the knowledge that such employees would have no recourse in pursuing proper wages and benefits or damages for workplace injuries. Such a result would thwart the Congressional objective of preventing American employers from hiring undocumented aliens. By continuing to permit the recovery of lost wages by undocumented aliens, we help to ensure that such workers are no more attractive to employers than American citizens or authorized aliens, thus increasing the likelihood that employers will eschew the hiring of undocumented aliens.

The *Hoffman* court noted that when an undocumented alien is working in this country, some party—either the employer or the employee—has violated the IRCA. Both the employee and the employer are answerable to the federal government for any violations of the IRCA they may have committed, but a tortfea-

---

**3.** *See Correa v Waymouth Farms, Inc., supra* at 331 n 4; *Dowling v Slotnik, supra,* 244 Conn at 796, 810, 712 A2d at 404, 410-411; *Gates v Rivers Constr. Co., Inc., supra* at 1022; *Continental PET Tech., Inc. v Palacias, supra,* 269 Ga App at 563-564, 604 SE2d at 630-631; *Rajeh v Steel City Corp.,* 157 Ohio App 3d 722, 731, 813 NE2d 697, 703 (2004); *National Labor Relations Bd. v A.P.R.A. Fuel Oil Buyers Group, Inc.,* 134 F3d 50, 55-56 (1997); *Mendoza v Monmouth Recycling Corp., supra,* 288 NJ Super at 248, 672 A2d at 225; *Patel v Quality Inn S., supra* at 704-705; *Local 512, Warehouse & Off. Workers' Union v National Labor Relations Bd., supra* at 720; *National Labor Relations Bd. v Apollo Tire Co., Inc.,* 604 F2d 1180, 1183 (1979); *Montoya v Gateway Ins. Co., supra,* 168 NJ Super at 104, 401 A2d at 1104; *Pontes v New England Power Co.,* 18 Mass L Rptr 183, 2004 WL 2075458, 2004 Mass Super LEXIS 340 (Aug. 19, 2004); *Singh v Jutla & C.D. & R's Oil, Inc.,* 214 F Supp 2d 1056, 1062 (2002); *Contreras v Corinthian Vigor Ins. Brokerage, Inc.,* 25 F Supp 2d 1053, 1056 (1998).

sor is independently answerable to the employee for any violations of its statutory or common-law duties under New York law. Allowing the defendants to avoid any aspect of damages for which they would otherwise be responsible would facilitate exploitation of alien workers, and would unjustly enrich even scrupulous defendants (*see Nizamuddowlah v Bengal Cabaret, Inc., supra,* 69 AD2d at 876 ["(R)ecovery must be permitted in order to prevent the unjust enrichment of the defendants. Even illegal aliens have the right to pursue civil suits in our courts, and the practice of hiring such aliens, using their services and disclaiming any obligation to pay wages because the contracts are illegal is to be condemned" (citation omitted)]; *Design Kitchen & Baths v Lagos,* 388 Md 718, 733, 882 A2d 817, 826 [2005] [denying workers' compensation coverage to undocumented aliens would allow unscrupulous employers to "take advantage of this class of persons and engage in unsafe practices with no fear of retribution"]; *National Labor Relations Bd. v Apollo Tire Co., Inc., supra* at 1184 [Kennedy, J., concurring] ["If the NLRA were inapplicable to workers who are illegal aliens, we would leave helpless the very persons who most need protection from exploitative employer practices such as occurred in this case"]). Moreover, reducing or eliminating safeguards and remedies available to undocumented aliens would have a deleterious effect on similar protections afforded to the work force in general (*see Local 512, Warehouse & Off. Workers' Union v National Labor Relations Bd., supra* at 719; *Rajeh v Steel City Corp., supra,* 157 Ohio App 3d at 731, 813 NE2d at 703; *Mendoza v Monmouth Recycling Corp., supra,* 288 NJ Super at 247, 672 A2d at 225; *Pontes v New England Power Co., supra*; HR Rep No. 99-682[I], 99th Cong, 2d Sess, at 45, 58, reprinted in 1986 US Code Cong & Admin News, at 5649, 5662 ["application of the NLRA" to undocumented aliens " 'helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment,' " quoting *Sure-Tan, Inc. v NLRB, supra* at 893]).

In *Sanango v 200 E. 16th St. Hous. Corp.* (15 AD3d 36 [2004]), the Court reasoned that depriving undocumented aliens of lost wages is justified because "[w]e are not aware of any other context in which a person who has derived income from an illegal activity is permitted, after a personal injury forces him to abandon that activity, to recover damages based on the lost stream of illegal income through judicial proceedings in a court

of law" (*id*. at 43). We do not find this reasoning persuasive. An undocumented alien performing construction work is not an outlaw engaged in illegal activity, such as bookmaking or burglary (*see Murray v Interurban St. Ry. Co.*, 118 App Div 35 [1907]; *see also Watts v Malatesta*, 237 App Div 558 [1932], *affd* 262 NY 80 [1933]). Rather, the work itself is lawful and legitimate; it simply happens to be work for which the alien is ineligible or disqualified (*see Montoya v Gateway Ins. Co., supra*, 168 NJ Super at 106, 401 A2d at 1105). Remedies have been awarded to individuals in analogous positions (*see Noreen v Vogel & Bros.*, 231 NY 317 [1921] [minor employed in violation of child labor law, who obtained the job by misrepresenting his age, was entitled to workers' compensation benefits after sustaining a workplace injury]; *Robinson Frgt. Lines*, 129 NLRB 1040, 1042, 1042 n 5 [1960] [truck driver awarded back pay despite lack of chauffeur's license]; *Operating Engrs. Local 57 (M.A. Gammino Constr. Co.)*, 108 NLRB 1225 [1954] [crane operator awarded back pay despite lack of engineer's license required under state law]).

The *Sanango* court's analysis was apparently based on the following premise: "[W]e believe that plaintiff's acceptance of unlawful employment should be deemed to constitute misconduct contravening IRCA's policies whether or not he submitted false documents" (*Sanango v 200 E. 16th St. Hous. Corp., supra* at 42). There is no support for that premise in the *Hoffman* decision, and certainly not in the IRCA. The INA did not criminalize an alien's acceptance of employment after entering this country illegally (*see Sure-Tan, Inc. v NLRB, supra* at 893), and no such provision was added by the IRCA. On the contrary, the IRCA was specifically designed to hold *employers* responsible for preventing unauthorized employment by verifying every employee's eligibility to work in the United States. An employer violates the IRCA by hiring an undocumented alien, but an undocumented alien does not violate the IRCA by working in this country (*see Correa v Waymouth Farms, Inc., supra* at 329; *Dowling v Slotnik, supra*, 244 Conn at 813 n 17, 712 A2d at 412 n 17). Thus, there is no sound basis for attributing "misconduct" to every undocumented alien who accepts employment in this country. While a presumption of "misconduct" on the part of every employer that hires an undocumented alien is also unjustified, the fact remains that depriving undocumented aliens of lost wages would, in effect, grant partial immunity from duties such as those imposed by Labor Law § 240 (1) and § 241 (6) to

employers and other defendants who benefit from the labor of those aliens, thus producing a windfall in favor of such defendants.

Other rationales for expanding the holding of *Hoffman* to deny lost wages to undocumented aliens are equally untenable. In *Veliz v Rental Serv. Corp. USA, Inc.* (313 F Supp 2d 1317 [2003]), the court reasoned that "[a]warding lost wages is akin to compensating an employee for work to be performed," that "if this Court were an employer, it would be compelled to discharge [the decedent]," and that a court's award of lost wages in such a case "would be tantamount to violating the IRCA" (*id.* at 1336). Such reasoning reveals a misunderstanding of the purposes underlying the IRCA. The statute is not designed to prevent compensation of undocumented aliens (either for work already performed or for work "to be performed"), but to prevent the employment of undocumented aliens in the first instance. Limiting or precluding the compensation of such aliens can only have the effect of encouraging employers to hire them.

In prior decisions, this Court has held that a plaintiff's immigration status is relevant to a determination of damages for lost wages and presents an issue of fact to be resolved by the jury (*see Vasquez v Sokolowski*, 277 AD2d 370 [2000]; *Avendano v Sazerac, Inc.*, 221 AD2d 395 [1995]; *Gomez v Long Is. R.R.*, 201 AD2d 455 [1994]; *Collins v New York City Health & Hosps. Corp., supra*). Contrary to the defendants' contention, those cases should not be read as holding that an undocumented alien, merely by virtue of his or her lack of authorization to work in this country, may be precluded from recovering damages for lost wages. Rather, the jury may take the plaintiff's status into account, along with the myriad other factors relevant to a calculation of lost earnings, in determining, as a practical matter, whether the plaintiff would have continued working in the United States throughout the relevant period, or whether his or her status would have resulted in, e.g., deportation or voluntary departure from the United States (*see e.g. Hernandez v M/V Rajaan, supra* at 500 [undocumented alien entitled to damages for future lost wages at United States rates absent defense proof that he "was about to be deported or would surely be deported"]). Illegal conduct by the plaintiff will automatically foreclose an award of damages for lost wages only when the work itself is of an unlawful nature (*see Watts v Malatesta, supra; Murray v Interurban St. Ry. Co., supra*) or when the plaintiff's injury is "the direct result" of his or her commission

of a "serious criminal act" (*Barker v Kallash*, 63 NY2d 19, 24 [1984]).

In this case, the record contains no evidence indicating whether or not J & C was aware that the plaintiff was an undocumented alien, whether or not J & C complied with the document examination requirements of the IRCA, or whether or not the plaintiff violated the IRCA by submitting false documents at the time he was hired. Accordingly, this case could easily be distinguished from *Hoffman* on the ground that the *Hoffman* decision rested heavily on the fact that the employee in that case had obtained the job from which he was fired by submitting a fraudulent birth certificate indicating that he was an American citizen, thereby subverting the IRCA's enforcement mechanism. We have concluded, however, that the *Hoffman* decision simply does not apply to awards of damages in personal injury actions. Therefore, we do not limit our holding to cases in which the plaintiff can prove that he or she has not submitted a fraudulent document in violation of the IRCA or that the employer was aware of his or her immigration status (*see Continental PET Tech., Inc. v Palacias, supra,* 269 Ga App at 565, 604 SE2d at 631 [undocumented alien's submission of fraudulent documents to obtain employment did not vitiate her right to recover workers' compensation benefits "where the employer failed to show a causal connection between the employee's misrepresentation and the . . . injury suffered by the employee"]; *but see Rosa v Partners in Progress, Inc.,* 152 NH 6, 13, 868 A2d 994, 1000 [2005] [undocumented alien may recover lost wages at United States rates only from "a person responsible for [the] illegal alien's employment who knew or should have known of the . . . alien's status"]). An undocumented alien's submission of a false document to satisfy the IRCA's verification requirements is punishable by a fine and imprisonment for up to five years (*see* 18 USC § 1546 [b]), and in our view, withholding damages for lost wages does not provide a meaningful degree of additional deterrence. Indeed, in the analogous context of child labor, a New York statute authorizes *double* recovery of workers' compensation benefits by underage workers, despite their complicity in an illegal employment relationship and even their fraudulent misrepresentations to their employers concerning their age (*see* Workers' Compensation Law § 14-a [1]; *Matter of Sackolwitz v Charles Hamburg & Co.,* 295 NY 264 [1946]).

As we have noted, withholding lost wages from undocumented aliens would create a perverse incentive for employers to hire

such aliens. Were employers, general contractors, and property owners allowed to escape liability for lost wages where they are purportedly unaware of an employee's undocumented status, an incentive would still exist for employers to remain willfully ignorant of prospective employees' immigration status and to hire undocumented aliens "with a wink and a nod" (*Hoffman Plastic Compounds, Inc. v NLRB, supra* at 156 [Breyer, J., dissenting]; *cf. Rosa v Partners in Progress, Inc., supra,* 152 NH at 15, 868 A2d at 1001 [holding general contractors to a standard of constructive knowledge concerning an undocumented alien's status, because "to hold otherwise would provide a general contractor with a convenient device to insulate itself from damages, because it would be all too easy to claim ignorance"]). Only by equalizing defendants' potential liability for injuries to authorized and unauthorized workers can the objectives underlying both federal immigration law and this state's tort law and workplace safety statutes be realized.

The defendants' and the third-party defendant's remaining contentions are without merit.

Accordingly, we reverse the order, with one bill of costs to the appellant payable by the respondents appearing separately and filing separate briefs, deny the motions, and reinstate the claim for lost wages.

S. Miller, Ritter and Goldstein, JJ., concur.

Ordered that the order is reversed, on the law, with one bill of costs payable to the appellant by the respondents appearing separately and filing separate briefs, the motions are denied, and the claim for lost wages is reinstated.