OPINION OF THE COURT
Karla Moskowitz, J.
This dispute involves the payment of wages to plaintiffs, undocumented aliens at the time of employment, who worked on defendants’ construction projects with municipal corporations, including the New York City School Construction Authority and the New York City Housing Authority. By this motion (sequence No. 004), defendants Kel-Tech Construction, Inc., Reliance Insurance Company and United States Fidelity and Guaranty Company (USF&G)* move for summary judgment to (1) dismiss the claims of plaintiffs Adeline Carpió and Jose Luis Zamora because Carpió and Zamora executed releases and settlement agreements that bar all claims against defendants, and (2) dismiss the claims of all plaintiffs, except those of Jose Archilla, because of plaintiffs’ allegedly illegal conduct in securing employment with Kel-Tech that could preclude them from bringing claims. On the same grounds of plaintiffs’ allegedly illegal conduct, defendants move for summary judgment to dismiss all plaintiffs’ second and third causes of action, except Archilla’s, in the second amended complaint. Defendants also request partial summary judgment to dismiss the claim that all plaintiffs worked at ES. 24 in the Bronx because, defendants claim, neither plaintiffs nor Kel-Tech ever worked on this project.
At oral argument, the court decided not to enforce as a matter of law the releases that plaintiffs Carpió and Zamora had signed because their depositions raised issues of fact about the circumstances under which defendants had obtained the releases. (Transcript of oral argument, dated Sept. 14, 2006, at 19.) The court then denied that part of defendants’ summary judgment motion based on Carpio’s and Zamora’s releases. (Id. at 20.) The court also dismissed plaintiffs’ claims regarding defendants’ alleged project at ES. 24 in the Bronx. (Id. at 41.) Because plaintiffs could not produce anything in opposition to defendants’ request to dismiss, the court granted defendants summary judgment on all claims that relate to ES. 24. (Id.)
This decision and order therefore addresses the remaining issues: defendants’ motion for summary judgment to dismiss all *178 claims because of plaintiffs’ alleged illegal conduct and to dismiss the second and third causes of action on the same grounds for the alleged project at William Taft High School in the Bronx. For the reasons below, the court denies defendants’ motion for summary judgment to dismiss all claims, including the second and third causes of action in the second amended complaint.
Background
The following facts are primarily from the second amended complaint, the answer to the second amended complaint and other papers the parties submitted on this motion.
Kel-Tech hired plaintiffs Carpió, Zamora, Jaime Pineda, Oscar L. Orellana, Edgar Amilcar Hernandez, Jose Luis Agustín (J.L. Agustín) and Melvin Agustín (M. Agustín) in or about July 1999 (defendants’ 19 [a] statement of facts 11 8), but plaintiffs claim their employment began in or about 1998. (Second amended complaint 1Í 16.) Since 1998, Kel-Tech held public works contracts with various municipal agencies to perform general construction work. (Id. 1Í14.) These public works contracts included projects for the New York City School Construction Authority and the New York City Housing Authority. Plaintiffs claim they worked on four projects: William Taft High School in the Bronx, McKee High School in Staten Island, Brevoort Houses in Brooklyn and PS. 24 in the Bronx. (Plaintiffs’ rule 19 [b] statement 1Í16.) However, for one of the alleged projects, at William Taft High School in the Bronx, Kel-Tech denies the existence of a written contract. (Affidavit of Vincent Kelleher, dated May 15, 2006, 11 2.) Kel-Tech also denies that it ever performed work at another alleged project, PS. 24 in the Bronx. (Id. 1Í 3.)
Under article 8 of the Labor Law, public works contracts require the payment of the prevailing wage and supplemental benefits to all workers. (Second amended complaint 11116, 8.)
Plaintiffs claim that Kel-Tech avoided paying them the prevailing wage and supplemental benefits through a money-laundering scheme. Plaintiffs state that Kel-Tech owed them two weekly checks, but they only received the first check. (Transcript of oral argument, dated Sept. 14, 2006, at 9.) As a result, Kel-Tech has not compensated plaintiffs for all the hours they worked. (Id.) Specifically, plaintiffs allege that Kel-Tech wrote two checks to each plaintiff but that the second checks bear signatures that do not resemble those of plaintiffs. (Id. at *179 10. ) Moreover, even though the dates are the same on the second and first checks, different locations cashed the checks: bars in Astoria cashed the second checks, but plaintiffs cashed the first checks near their homes. (Id.) Plaintiffs explain these discrepancies by saying Kel-Tech was “giving the worker one check and then the other check they were pocketing and keeping as cash, and they were showing on payroll that were given [sic] to the School Construction Authority, certified payrolls that these workers had received money that they never received.” (Id. at 11. )
To justify its refusal to pay, Kel-Tech counters that plaintiffs offered false documentation to obtain employment, in contravention of federal law, namely, the Immigration Reform and Control Act (IRCA). However, defendants only discovered this alleged use of fraudulent documents and plaintiffs’ undocumented status after plaintiffs filed suit when defendants’ counsel followed up on disclosures plaintiffs’ counsel made during the examination before trial of Kel-Tech president Philip Kelleher. (Affidavit of Vincent Kelleher, dated July 20, 2006, 1Í1Í15-16; affirmation of Ahmed Massoud, dated Apr. 5, 2005,1Í 31, in Kelleher affidavit, dated July 20, 2006, exhibit A.) Kel-Tech further states that, at the time of hiring, plaintiffs did not disclose their undocumented status. Instead, defendants contend that plaintiffs, except Archilla, presented Kel-Tech with falsified Social Security numbers. (Defendants’ mem in support of motion for summary judgment at 3; Kelleher affidavit, dated May 15, 2006, 1110.) Defendants state plaintiffs admitted in depositions that “they utilized either fake Social Security numbers, or numbers issued for banking purposes only, in order to secure employment with Kel-tech.” (Transcript of oral argument, dated Sept. 14, 2006, at 21.) Plaintiffs respond, “Some of them submitted what are called TIN numbers, Tax Identification numbers,” and their attorney at oral argument denied knowledge of false Social Security numbers. (Id. at 27.)
As sureties that underwrote the bonds for the public works projects, defendants Reliance and USF&G guaranteed payment of the required wages and benefits if Kel-Tech failed to pay them. Kel-Tech did not pay plaintiffs, and Reliance and USF&G, contrary to the terms of the bonds, refused payment as well. Plaintiffs contend that “[Reliance and USF&G] assumed joint liability to pay plaintiffs any and all prevailing wages and supplemental benefits due and owing to them which [former defendant Shroid or current defendant Kel-Tech] failed to pay *180 pursuant to the terms of the Bonds.” (Second amended complaint 1i1i 38, 42.)
On January 18, 2001, plaintiffs commenced this action, and, on April 18, 2002, they agreed to consolidate lawsuits certain plaintiffs had filed in the Supreme Court, Kings County, as early as November 1999. (Stipulation, dated Apr. 18, 2002, at 3 in Massoud affirmation, dated May 15, 2006, exhibit A.) The total amount plaintiffs seek in unpaid wages and benefits against defendants pursuant to Kel-Tech’s public work contracts is approximately $280,000, plus interest. (Second amended complaint 1118.) The complaint contains six causes of action: breach of contract against Kel-Tech (first cause of action), quantum meruit against Kel-Tech (second cause of action), unjust enrichment against Kel-Tech (third cause of action), violation of the New York State Constitution against Kel-Tech (fourth cause of action), suretyship against Reliance (fifth cause of action) and suretyship against USF&G (sixth cause of action). The court previously dismissed the fourth cause of action. (Stipulation and order, dated Mar. 28, 2005, at 2 in Massoud affirmation, dated May 15, 2006, exhibit K.) In addition, the court has already dismissed plaintiffs’ claims for quantum meruit and unjust enrichment relating to ES. 24 in the Bronx.
Discussion
Pursuant to CPLR 3212 (b), a court grants summary judgment if “upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party.” (See also Zuckerman v City of New York, 49 NY2d 557, 562 [1980].) A court denies the motion “if any party shall show facts sufficient to require a trial of any issue of fact.” (CPLR 3212 [b].) “This standard requires that the proponent of a motion for summary judgment make a prima facie showing of entitlement to judgment as a matter of law, by advancing sufficient evidentiary proof in admissible form to demonstrate the absence of any material issues of fact.” (Sbar v District Council 37 Health & Sec. Fund Trust, 12 Misc 3d 1176[A], 2006 NY Slip Op 51246[U], *3 [Sup Ct, NY County 2006] [internal quotation marks and citations omitted].)
I. Dismissal of All Claims Because of Plaintiffs’ Alleged Illegal Conduct
Defendants contend that use of fraudulent documentation to secure employment with Kel-Tech
*181 “would preclude plaintiffs’ claims for prevailing wages — which can only be lawfully earned by persons who are legally authorized to accept employment in the United States . . . [and that] having engaged in illegal conduct . . . , plaintiffs are precluded from claiming entitlement to prevailing wages under any of the theories pursuant to which they brought their claims.” (Massoud affirmation, dated Apr. 5, 2005, 1Í1Í 47-48.)
Plaintiffs, on the other hand, insist, “Plaintiffs’ recovery of unpaid wages strengthens public policy and furthers the goal of the Immigration Reform and Control Act of 1986.” (Affirmation of Lloyd Ambinder, dated June 20, 2006, 11 14.) Although defendants stated at oral argument, “We don’t even have a Labor Law Section 220 claim here. What we have is an alleged allegation that there are third-party beneficiaries of contracts entered into between the defendant subcontractor with the contractor” (transcript of oral argument, dated Sept. 14, 2006, at 24), neither party briefed the issue of third-party beneficiaries, and the focus of oral argument and the briefs was payment of wages under New York law and the Immigration Reform and Control Act.
At oral argument, the court recognized the important issues that payment of wages to undocumented workers raises. First, the court stated, “we have an interest as a state [in] making sure that our prevailing wage statutes are carried out.” (Id. at 7.) Second, as discussed more fully below, New York State’s Labor Law article 8 conflicts with the IRCA regarding the circumstances under which undocumented aliens may receive payment. It seems
“there are two public policies that are in conflict, and the public policy that [defendants] are relying on is the public policy which has . . . to do with the new federal immigration law. But we also have on the other hand the public policy in New York state under the Labor Law.” (Id. at 23.)
A. New York State Labor Law, the IRCA and Payment of Wages Labor Law § 220 states, “The wages to be paid for a legal day’s work, as hereinbefore, defined, to laborers, workmen or mechanics upon such public works, shall be not less than the prevailing rate of wages as hereinafter defined.” (Subd [3].) Article 8 also provides that “supplements, as hereinafter defined, to be provided to laborers, workmen or mechanics upon such public works, shall be in accordance with the prevailing *182 practices in the locality, as hereinafter defined.” (Id.) Finally, “[a]ny person or corporation that wilfully pays or provides after entering into such contract or a subcontract to perform on any portion of such contract, less than such stipulated wage scale or supplements as established by the fiscal officer shall be guilty of a misdemeanor” (id.).
The New York Court of Appeals has described the purpose of article 8 in the following manner:
“We are here required to give effect to a unique statutory scheme, one that has as its entire aim the protection of workingmen against being induced, or obliged, to accept wages below the prevailing rate from a public employer. This court has more than once noted that section 220 must be construed with the liberality needed to carry out its beneficent purposes.” (Bucci v Village of Port Chester, 22 NY2d 195, 201 [1968] [citations omitted]; see also Brian Hoxie’s Painting Co. v Cato-Meridian Cent. School Dist, 76 NY2d 207, 212 [1990] [“But the overriding purpose of the prevailing wage requirements is to ensure that workers on public projects receive adequate pay”].)
Unlike Labor Law article 8, the IRCA specifically addresses undocumented workers and the payment of their wages. Although this federal statute does not penalize these workers for gaining employment without proper work authorization, it does place limits on their hiring. First, “[i]n general. . . [i]t is unlawful for a person or other entity ... to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien” (8 USC § 1324a [a] [1] [A]). To this end, “[t]he person or entity must attest, under penalty of perjury and on a form designated or established by the Attorney General by regulation, that it has verified that the individual is not an unauthorized alien” (§ 1324a [b] [1] [A]). The employer complies with the requirement by “examination of a document if the document reasonably appears on its face to be genuine.” (§ 1324a [b] [1] [A] [ii].) Specifically, an employer must examine a “social security account number card” or “other documentation evidencing authorization of employment in the United States.” (§ 1324a [b] [1] [C] [ii].)
Second, the IRCA limits the ability of an undocumented worker to gain employment.
“Activities prohibited ... It is únlawful for any *183 person or entity knowingly ... to use, attempt to use, possess, obtain, accept, or receive or to provide any forged, counterfeit, altered, or falsely made document in order to satisfy any requirement of this chapter or to obtain a benefit under this chapter.” (8 USC § 1324c [a] [2].)
Further, the IRCA makes it “fraud and misuse of visas, permits, and other documents” to use “(1) an identification document, knowing (or having reason to know) that the document was not issued lawfully for the use of the possessor, . . . (2) an identification document knowing (or having reason to know) that the document is false, or . . . (3) a false attestation” (18 USC § 1546 [b]). Since 1990, the IRCA has imposed penalties on undocumented workers who “knowingly or recklessly used false documents to obtain employment” in the United States. (Madeira v Affordable Hous. Found., Inc., 469 F3d 219, 231 [2d Cir 2006].) In addition, it demands termination of any undocumented alien who uses fraud to obtain employment. (Id. at 242.)
Significantly, however, the “IRCA does not ‘undermine or diminish in any way labor protections in existing law, or . . . limit the powers of federal or state labor relations boards . . . to remedy unfair practices committed against undocumented employees.’ ” (Hoffman Plastic Compounds, Inc. v NLRB, 535 US 137, 157 [2002] [Breyer, J. (joined by Stevens, Souter and Ginsburg, JJ.), dissenting], quoting HR Rep No. 99-682 [I], 99th Cong, 2d Sess, at 58, reprinted in 1986 US Code Cong & Admin News, at 5649, 5662.) The dissent in Hoffman explained that IRCA itself “does not explicitly state how a violation is to effect the enforcement of other laws, such as the labor laws.” (Id. at 154-155; see also Madeira at 232 [“The statute is silent, however, as to its preemptive effect on any other state or local laws”].)
Thus,
“[t]he Court has recognized these considerations [employers who purposefully hire illegal aliens to lower the costs of labor law violations] in stating that the labor laws must apply to illegal aliens in order to ensure that ‘there will be no advantage under the NLRA in preferring illegal aliens’ and therefore there will be ‘fewer incentives for aliens themselves to enter.’ ” (Hoffman, 535 US at 156 [Breyer, J. (joined by Stevens, Souter and Ginsburg, JJ.), dissenting], quoting Sure-Tan, Inc. v NLRB, 467 US 883, 893-894 [1984].)
The IRCA does not diminish the protection of the National *184 Labor Relations Act (NLRA). Instead, the Supreme Court perceives the NLRA as a means to pursue the same goal, that of decreasing the employment of undocumented workers, because “[application of the NLRA helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment.” (Sure-Tan, 467 US at 893; see also Del Rey Tortilleria, Inc. v National Labor Relations Bd., 976 F2d 1115, 1121 [7th Cir 1992] [stating that, in keeping with the IRCA, the NLRA applies to illegal aliens as well as lawful residents].) In short, both the IRCA and the NLRA work together to ensure that employers do not treat undocumented workers unfairly because, without the IRCA and the labor laws, employers could easily offer undocumented workers less protection and lower wages than legal workers and thus take these jobs away from legal workers.
The IRCA also does not undermine the protections that the Fair Labor Standards Act (FLSA) affords. The FLSA requires payment of a minimum wage in the private and public sector. “Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following [minimum wage] rates” (29 USC § 206 [a]). The FLSA defines employee as “any individual employed by an employer.” (29 USC § 203 [e] [1].) As the NLRA does, the FLSA covers undocumented aliens because courts interpret the FLSA’s protection broadly. (See Patel v Quality Inn S., 846 F2d 700, 703 n 4 [11th Cir 1988]; see also Zavala v Wal-Mart Stores, Inc., 393 F Supp 2d 295, 322 [D NJ 2005] [stating that the FLSA covers undocumented workers].) In addition, the FLSA and the IRCA share the same objective because “[t]he FLSA’s coverage of undocumented workers has a similar effect [of reducing illegal immigration by eliminating the economic incentive to hire undocumented aliens] in that it offsets what is perhaps the most attractive feature of such workers — their willingness to work for less than the minimum wage.” (Patel, 846 F2d at 704.) Importantly, employers who seek to profit from illegal workers by underpaying them “run the risk of sanctions under the IRCA.” (Id.)
By assuring fair treatment of illegal workers and payment of at least a minimum wage to all workers, the NLRA and the FLSA resemble the guarantee of a “prevailing wage” that Labor Law article 8 provides. (See Labor Law § 220 [3].) For example, *185 similar to the protection of workers against unfair pay in article 8, “[t]he prime purpose of the [FLSA] was to aid the unprotected, unorganized and lowest paid of the nation’s working population” (,Zavala, 393 F Supp 2d at 320 [internal quotation marks omitted]). The FLSA merely mandates that, as a matter of federal law, employers must pay a minimum wage and “[n]othing in the FLSA suggests that undocumented aliens cannot recover unpaid minimum wages and overtime” {Patel, 846 F2d at 706). As discussed in the next section, the Labor Law applies to undocumented workers as well, and, just as the IRCA does not interfere with the protections of the FLSA and the NLRA, it does not prevent application of the Labor Law in this action.
B. Interpretation and Implementation of the Labor Law and the IRCA
First, when courts read the Labor Law and the IRCA together, they do not find any inconsistencies that prevent an undocumented worker from bringing a claim under the Labor Law. “[T]he public policy of the State of New York and the federal government is that the interest in enforcing wages and hours laws on behalf of all workers is paramount.” (Garcia v Pasquareto, 11 Misc 3d 1, 2 [App Term, 2d Dept 2004].) Thus, the IRCA and Labor Law article 8 share the same goals. The New York State Attorney General has addressed these shared goals of New York State and federal governments:
“Federal courts have explained that the policies underlying IRCA . . . would be furthered, not undermined, by payment of wages earned but not paid to undocumented immigrants ... If employers know that they will . . . also be required to pay them at the same rates as legal workers for work actually performed, there are virtually no incentives left for an employer to hire an undocumented alien in the first instance . . . We believe that the same argument supports enforcement of New York’s wage payment laws on behalf of unauthorized aliens.” {Garcia at 2-3, quoting 2003 Ops Atty Gen No. F 2003-3.)
New York courts do not therefore dismiss causes of actions for wages earned by undocumented workers simply because the labor contracts are illegal for, to do so, would “directly contravene the public policy of the State of New York and of the United States government.” {Id. at 3.)
Moreover, the IRCA does not preempt the Labor Law with regard to the payment of the prevailing wage to workers under *186 Labor Law article 8. The IRCA states, “Preemption . . . The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.” (8 USC § 1324a [h] [2]; see also Balbuena v IDR Realty LLC, 6 NY3d 338, 357 [2006] [“The plain language of section 1324a (h) (2) appears directed at laws that impose fines for hiring undocumented aliens . . . (This) preemption language . . . was intended to apply only to civil fines and criminal sanctions imposed by state or local law”].) The Labor Law provision at issue here reads, “The wages to be paid for a legal day’s work, as hereinbefore defined, to laborers, workmen or mechanics upon such public works, shall be not less than the prevailing rate of wages as hereinafter defined.” (Labor Law § 220 [3].) A state law that guarantees payment of wages is not a “[s]tate or local law imposing civil or criminal sanctions” for the employment of “unauthorized aliens” (8 USC § 1324a [h] [2]) that the IRCA would preempt.
Thus, there is “no evidence that IRCA . . . operated to preempt state law governing the right of undocumented aliens to recover damages of any sort in state court. . . [and] Congress had neither expressly preempted state law in enacting IRCA, nor entirely occupied the fields of workplace safety and common-law torts.” (Oro u 23 E. 79th St. Corp., 10 Misc 3d 82, 85 [App Term, 2d Dept 2005] [internal quotation marks omitted].) Just as compliance with safety rules under the Labor Law is distinct from compliance with federal immigration laws (see id. at 86), compliance with the prevailing wage requirement does not contravene the IRCA either because “between the worker and the employer there is a contract of employment, under which the worker is entitled to be paid for his or her work . . . [that does not depend on] a worker’s compliance with federal immigration laws.” (Id., quoting Majlinger v Cassino Contr. Corp., 25 AD3d 14, 24-25 [2d Dept 2005] [“The contractual, statutory, and common-law duties owed to the worker are unrelated to, and do not depend on, the worker’s compliance with federal immigration laws”]; see also Madeira, 469 F3d at 242.) That is, any alleged illegality under the IRCA occurs between the employer and the government or between the employee and the government, and, consequently, an employee may sue an employer for unpaid wages in spite of alleged IRCA violations. (See Oro, 10 Misc 3d at 86.)
Given that both the federal and New York State governments have established payment of fair wages to all workers, including *187 illegal immigrants, as the primary purpose of the IRCA and New York Labor Law and that the IRCA does not preempt the New York Labor Law, the court finds defendants’ interpretation of these laws misleading. Defendants state,
“[N]ot only would a decision upholding plaintiffs’ right to maintain the action trivialize the IRCA and subvert its stated goals, but it would also reward plaintiffs for engaging in criminal activities, and would condone and encourage peripheral criminal conduct, such as plaintiffs’ failure to file tax returns and declare the income they have earned, and which they continue to earn, in the United States in violation of its laws and statutes.” (Defendants’ mem of law in support of motion for summary judgment at 13.)
As this court’s preceding analysis indicates, plaintiffs’ action for unpaid wages would neither “trivialize” nor “subvert” the IRCA. Therefore, the court will not dismiss the complaint on the grounds that the IRCA bars plaintiffs’ claims.
Second, plaintiffs and defendants debate the implications of several cases, particularly Hoffman, Balbuena and Majlinger, but the court reads these cases as merely reinforcing the above analysis that leads to the conclusion that undocumented workers, no matter what type of documents they proffered or did not proffer at the time of employment, may still collect the prevailing wage under Labor Law § 220 for work they have performed. Because the cases the parties cite involve either back pay or compensation for injuries, they differ significantly from the facts in this action. Plaintiffs rightly point out that
“Defendants argue that Plaintiffs’ claims for unpaid wages actually earned are barred on the grounds that Plaintiffs procured employment through the use false documentation. However, Defendants’ argument fails as a matter of law as it relies solely on the severe misapplication of the holding of Hoffman . . . [and] this argument cannot serve as a basis for granting summary judgment.” (Plaintiffs’ mem of law in opposition to defendants’ motion for summary judgment at 7.)
In Hoffman, the Supreme Court denied an award of back pay to an undocumented alien who had tendered a fraudulent birth certificate at the time of employment but whose employer eventually fired him for union-organizing activities. (Hoffman, 535 US at 140.) In denying the worker back pay for wages he *188 would have earned had his employer not unlawfully fired him (the NLRA makes the firing of union organizers illegal) (id.), the Court did not rely solely on the worker’s use of fraudulent documents. Instead, it looked to several factors and stated, “award[ing] backpay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud . . . runs counter to policies underlying IRCA” (id. at 149). The most important consideration, however, was the type of relief that the undocumented worker sought because the Court stated “[w]e therefore conclude that allowing . . . [an] award [of] backpay to illegal aliens [for wages the workers would have earned] would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA.” (Id. at 151 [emphasis added].)
In Balbuena and Majlinger, the other two cases upon which both parties rely, the relief also differs from this action. Balbuena and Majlinger, both undocumented workers, sought lost wages for injuries that resulted from their employers’ work site violations under the Labor Law. (Balbuena, 6 NY3d at 351.) Although the workers in Balbuena and Majlinger, whose cases the Court of Appeals heard together, did not submit any false documents in violation of the IRCA, they were nonetheless undocumented and had not actually worked the hours for which they sought compensation. The Court of Appeals did not therefore rely on the prevailing wage statute (Labor Law § 220) to grant the workers relief.
“In the context of Labor Law claims [§§ 200, 240 (1) and § 241 (6)], a per se preclusion of recovery for lost wages would condone the employers’ conduct in contravention of IRCA’s requirements and promote unsafe work site practices, all of which encourages the employment of undocumented aliens and undermines the objectives that both IRCA and the state Labor Law were designed to accomplish.” (Balbuena at 362.)
Therefore, just as this court reinforces in this decision the importance of discouraging the employment of illegal aliens to justify plaintiffs’ claims for unpaid wages, the Court of Appeals in Balbuena actually granted relief to the workers using the same rationale.
Indeed, compensation awards often depend on whether plaintiffs seek unpaid wages or back pay. For example, back pay *189 awards “cover[ ] periods that [undocumented workers] were not working due to wrongful termination” (Oro, 10 Misc 3d at 84). Unpaid wages, on the other hand, involve “pay[ment] to undocumented aliens wages for work actually performed” (see id. at 86). “To condone dismissal of actions for wages earned but not paid, regardless of the legal theory employed, on the ground that such labor contracts are ‘illegal,’ would thus directly contravene the public policy of the State of New York and of the United States government.” (Garcia, 11 Misc 3d at 3; see also Gomez v Falco, 6 Misc 3d 5, 6 [App Term, 2d Dept 2004] [“While back pay awards to undocumented workers for periods of unemployment, e.g., wrongful termination for union activity, are barred by federal immigration law, the award in the present case properly represents payment due and owing for work actually performed” (citations omitted)].) In Ulloa v Al’s All Tree Serv., however, the court dismissed part of an action for unpaid wages but only because the undocumented worker sought compensation for overtime and because the court assumed that all contracts with undocumented workers, despite the absence of fraud, were “tainted with illegality.” (Ulloa v Al’s All Tree Serv., 2 Misc 3d 262, 264 [Nassau Dist Ct 2003].) The court did allow the worker’s claim for unpaid minimum wages. (Id.)
Thus, some debate does remain about compensation of undocumented workers for hours they actually worked, especially when the workers used false documents to procure the employment. However, no court has fully addressed the issue of unpaid wages for work that undocumented aliens have performed when the undocumented aliens have also tendered false documents. In dicta, Ulloa stated, “The court also notes in passing that, if there had been proof in this case that the plaintiff had obtained his employment by tendering false documents (activity that is explicitly unlawful under IRCA), Hoffman would require that the wage claim be disallowed in its entirety.” (Id.) But, because Judge Howard S. Miller of the Nassau District Court made that remark, this court is in no way obliged to concur. Moreover, the Appellate Term, Second Department, has already discounted Ulloa-. “We find unpersuasive the holding of Ulloa . . . that no award above minimum wage is permissible because of the ‘illegality’ of the employment agreements involved, since there is no basis for any such limitation whether the theory of recovery is Labor Law § 198 or under common-law contract.” (Garcia, 11 Misc 3d at 3.) This court therefore prefers to extrapolate from federal and New York State public policy (see A and B, supra) a *190 basis for undocumented workers to claim unpaid wages for work they have already performed, even if like plaintiffs here they allegedly proffered fraudulent documents to obtain employment.
Further, the federal courts “addressing the issue of whether defendants should be allowed to discover plaintiff-workers’ immigration status in cases seeking unpaid wages brought under the FLSA have found such information to be undiscoverable” because this discovery is irrelevant and could harm plaintiffs’ ability to bring their claims. (Zeng Liu v Donna Karan Intl., Inc., 207 F Supp 2d 191, 192-193 [SD NY 2002] [citations omitted]; see also Flores v Amigon, 233 F Supp 2d 462, 464 [ED NY 2002] [denying discovery of immigration status in unpaid wages case because “discovery . . . was irrelevant and posed a serious risk of injury to the plaintiffs”].) If federal courts ban discovery on immigration status in unpaid wages cases, the use of fraudulent documents on immigration status to gain employment in unpaid wages cases is likewise irrelevant. The only crucial issue is whether the undocumented worker performed services for which the worker deserves compensation. If so, public policy requires payment so that employers do not intentionally hire undocumented workers for the express purpose of citing the workers’ undocumented status or their use of fraudulent documents as a way to avoid payment of wages.
C. Analysis of Plaintiffs’ Claims and Defendants’ Argument of Illegal Conduct
Even if public policy did not allow plaintiffs’ claims, questions of fact about alleged illegality enable plaintiffs’ claims to survive defendants’ motion for summary judgment. Defendants, however, insist,
“[i]n this case, plaintiffs Adelino Carpió, Jose Luis Zamora, Oscar L. Orellana, Edgar Amilcar Hernandez, Jose Luis Agustín, Melvin Agustín and Jaime Pineda all gained their employment by engaging in criminal conduct specifically prohibited by federal law . . . [T]herefore, based on the Court of Appeals’ express acknowledgment in Balbuena, plaintiffs are foreclosed from seeking recovery for injuries allegedly sustained as a result of their own serious violation of law.” (Defendants’ reply mem at 10.)
The court does not read Balbuena as conclusively as defendants do so as to automatically unsuit plaintiffs in this action. Although Balbuena did repeat the Supreme Court’s observation in Hoffman that “ ‘[ujnder the IRCA regime, it is impossible for *191 an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies’ ” (Balbuena, 6 NY3d at 354, quoting Hoffman, 535 US at 148), defendants overlook Kel-Tech’s own potential violations and overstate plaintiffs’ potential violations. As Balbuena explained, the IRCA creates two separate crimes: (1) the employer commits a crime if it does not, “[bjefore hiring an alien . . . verify the prospective worker’s identity and work eligibility by examining the government-issued documentation”; and (2) for the alien, “it is a crime ... to provide a potential employer with documents falsely acknowledging receipt of governmental approval of the alien’s eligibility for employment.” {Id. at 353, 354, citing 8 USC § 1324a [a] [1]; § ,1324c [a].) Because the court finds, based on the papers before it, that there are issues of fact with regard to potentially criminal actions on the part of both Kel-Tech and the plaintiffs, it cannot grant defendants’ motion for summary judgment.
For example, it is unclear Kel-Tech ever demanded the required documentation from plaintiffs because defendants only discovered plaintiffs’ alleged use of fraudulent documents and plaintiffs’ undocumented status after plaintiffs filed suit. (Kelleher affidavit, dated July 20, 2006, 1HÍ15-16.) Specifically, after the deposition of Kel-Tech’s president Philip Kelleher, when defendants learned from plaintiffs’ counsel that some or all of the plaintiffs were undocumented during their employment, defendants’ counsel submitted a third set of interrogatories to demand Social Security numbers, work authorization status and documentation at the time of hire. (Massoud affirmation, dated Apr. 5, 2005,1Í 33.) Thus, questions exist as to whether or not Kel-Tech ever collected the alleged fraudulent documentation from plaintiffs, and, under the IRCA, an employer must do so before hiring the worker.
Further, in his deposition, Kel-Tech president Kelleher described a very informal hiring process that would unlikely lead to compliance with the IRCA for either the employer or employee. In his deposition, he denied knowledge of 1-9 immigration forms and, to the best of his knowledge, denied that Kel-Tech maintains, collects or generates 1-9 forms for new employees. (Deposition of Philip Kelleher, dated June 9, 2004, at 22, in Ambinder affirmation, dated June 20, 2006, exhibit B.) He also stated that “nobody, really” would know about these forms. (Id.) According to Kelleher, Kel-Tech only examines driver’s licenses and does not “take any affirmative steps to *192 ensure that its employees were legal aliens.” (Id.) Kelleher admitted, “with a license and a Social Security number, I guess you presume that the guy is legal.” (Id. at 23.)
More importantly, it is uncertain which, if any, of the plaintiffs actually showed documents to Kel-Tech. In direct contradiction to Philip Kelleher’s deposition, Vincent Kelleher, Kel-Tech vice-president, claimed that, at the time of hire, plaintiffs completed W-4 tax forms and produced Social Security cards and either a driver’s license or an identity card (Kelleher affidavit, dated July 20, 2006, 1f 15). In the six depositions before the court on this motion, however, none of the plaintiffs mentioned presenting any actual cards (if asked, they gave only Social Security numbers) or completing W-4 tax forms. (See deposition of Adeline Carpió, dated Nov. 30, 2005 at 10, 12, in Massoud affirmation, dated May 15, 2006, exhibit L [stating that he never gave Kel-Tech a Social Security number, that Kel-Tech asked him nothing and that, later during his employment at Kel-Tech, he gave a tax identification number (TIN)]; deposition of Jose Luis Zamora, dated Sept. 23, 2005, at 13-14, in Massoud affirmation, dated May 15, 2006, exhibit M [stating he obtained a Social Security number only after his employment with Kel-Tech and that no employer ever asked for one before he obtained a number]; deposition of Oscar Orellana, dated Nov. 30, 2005, at 8, 15, in Massoud affirmation, dated May 15, 2006, exhibit N [stating that, after his hire, Kel-Tech requested a Social Security number and he gave them a number but it was a TIN and that Kel-Tech never asked for work authorization]; deposition of Edgar Amilcar Hernandez, dated Dec. 1, 2005 at 7, 10, in Massoud affirmation, dated May 15, 2006, exhibit O [stating that Kel-Tech never asked if he had work authorization and that he could not remember giving them a Social Security number]; deposition of Melvin Agustín, dated Dec. 1, 2005, at 9, in Massoud affirmation, dated May 15, 2006, exhibit P [stating that he did not have work authorization and admitting that he invented a Social Security number for Kel-Tech]; deposition of Jaime Pineda, dated Dec. 1, 2005, at 8-9, in Massoud affirmation, dated May 15, 2006, exhibit Q [stating that he did not recall giving Kel-Tech a Social Security number and that he did not recall having one at the time of his hire].)
As a result of the investigation defendants launched after allegedly learning of plaintiffs’ undocumented status during the Kel-Tech president’s deposition, defendants learned that the Social Security numbers Orellana, Hernandez, M. Agustín and *193 J.L. Agustín had allegedly submitted at hire belonged to other people. (Massoud affirmation, dated Apr. 5, 2005, H 35.) Because plaintiff Orellana admitted providing a TIN and plaintiff M. Agustín admitted inventing a Social Security number (Orellana deposition at 8, 15; M. Agustín deposition at 9), defendants’ fraud accusations would be viable except that Orellana and M. Agustín did not admit providing any of the documentation that the IRCA requires for a criminal charge (see Balbuena, 6 NY3d at 353-354, citing 8 USC § 1324a [a] [1]; § 1324c [a]). In fact, none of the plaintiffs admitted providing any documents. Despite defendants’ claim that Hernandez submitted a false Social Security number, Hernandez could not remember giving a number (Hernandez deposition at 7, 10), so the court cannot say as a matter of law on summary judgment that no issues of fact exist. As for J.L. Agustín, the court does not have an affidavit or a deposition from him, so his exact situation remains unclear. Finally, Carpió admitted providing a TIN but no documentation that IRCA requires for a criminal charge, Zamora stated that Kel-Tech never requested a Social Security number and Pineda could not remember what he provided KelTech. (Carpió deposition at 10, 12; Zamora deposition at 13-14; Pineda deposition at 8-9.)
The court can therefore not accept defendants’ contention that Carpió, Zamora, Orellana, Hernandez, J.L. Agustín, M. Agustín and Pineda “failed to dispute any of the facts [gaining employment with Kel-Tech by providing falsified documents] presented by defendants in support of their instant motion, but they have themselves admitted all such facts.” (Defendants’ reply mem at 8.) Nor can the court support defendants’ conclusion “such conduct bar[s] plaintiffs’ claims.” (Id.) In addition to denying summary judgment for public policy reasons (see A and B, supra), the court denies summary judgment in favor of defendants because issues of fact exist that the record currently before the court cannot settle.
II. Dismissal of Plaintiffs’ Second and Third Causes of Action Because of Plaintiffs’ Alleged Illegal Conduct
During oral argument, the court dismissed plaintiffs’ claims relating to PS. 24 in the Bronx, but the parties continued to debate the second (quantum meruit) and third (unjust enrichment) causes of action relating to William Taft High School. (Transcript of oral argument, dated Sept. 14, 2006, at 41.) In their depositions, all plaintiffs, except Hernandez, recalled working at Taft. (See Carpió deposition at 26; Zamora deposition at *194 20; Orellana deposition at 13; Hernandez deposition at 11; M. Agustín deposition at 11; Pineda deposition at 10-11.) However, M. Agustín stated he worked at Taft with Hernandez and with his brother J.L. Agustín. (M. Agustín deposition at 11, 13.) To dismiss these causes of action, defendants repeat their argument that plaintiffs “readily acknowledge and admit” use of falsified documentation to gain employment with Kel-Tech and thus assert “[u]nder the circumstances, plaintiffs, being guilty of inequitable conduct, cannot seek the court’s aid in enforcing claims under equitable theories.” (Defendants’, mem of law in support of motion for summary judgment at 14.)
The court finds defendants’ argument of unclean hands somewhat disingenuous because Kel-Tech itself allegedly organized a scheme in which it cashed checks that it had written to plaintiffs and then kept the proceeds for itself. (Transcript of oral argument, dated Sept. 14, 2006, at 9.) This scheme is even more egregious because it involved absconding with money that Kel-Tech earned from the State through its public works contracts with the New York City School Construction Authority and the New York City Housing Authority. Kel-Tech also made certified representations to the School Construction Authority that it had paid plaintiffs from the payroll. {Id. at 28, 32.) In essence, Kel-Tech worked for the State and should have felt compelled to uphold both New York public policy and the Labor Law that require payment of the prevailing wage to workers on public works contracts. Moreover, despite accusing plaintiffs of IRCA violations and using these violations as grounds for summary judgment, Kel-Tech never clarifies whether it followed the requirements of the IRCA for employers, namely, collecting documents and asking questions to verify work authorization.
In addition to concerns about defendants’ own unclean hands, the court, as explained in the previous section, cannot as a matter of law conclude that no issues of fact exist regarding plaintiffs’ conduct. “Where a litigant has himself been guilty of inequitable conduct with reference to the subject matter of the transaction in suit, a court of equity will refuse him affirmative aid.” (Levy v Braverman, 24 AD2d 430, 430 [1st Dept 1965]; see also Janet O. v James O., 13 Misc 3d 1225[A], 2006 NY Slip Op 51985[U], *3 [Sup Ct, NY County 2006] [stating party cannot seek equitable relief with unclean hands].) Because the court *195 finds questions of fact about plaintiffs’ conduct, it refuses to dismiss their causes of action for unjust enrichment and quantum meruit for work at Taft. Accordingly, the court denies defendants’ request to dismiss the remaining part of the second and third causes of action because of plaintiffs’ allegedly illegal conduct.
Conclusion
Accordingly, it is ordered that defendants’ request for partial summary judgment for claims relating to ES. 24 in the Bronx is granted and the motion is otherwise denied; and it is further ordered that the complaint is deemed amended accordingly.

 After Shroid Construction, Inc. filed for chapter 11 bankruptcy protection, plaintiffs severed and dismissed their claims against this defendant. (Order, dated Sept. 30, 2004, in affirmation of Ahmed A. Massoud, dated May 15, 2006, exhibit J.)