OPINION OF THE COURT
Rolando T. Acosta, J.
Background
This action arises out of a February 4, 2005 construction site accident. F & T Int’l (Flushing, New York) LLC was the owner of a certain property in Queens county, which it bought to develop into a 12-story commercial building, with retail spaces, office condominiums, entertainment complexes and parking. The general contractor, Top 8 Construction Corp., retained Diamond Point Excavating Corp. to demolish an existing building on the property. Having no demolition experience, Diamond Point subcontracted the demolition job to Prestige Carting Corporation. Both plaintiffs worked for Prestige, and were injured when a portion of the third floor gave way as they were demolishing it. Gomez suffered multiple fractures to his vertebrae, requiring spinal fusion, and resulting in paraplegia, and Livicura sustained bilateral wrist fractures, necessitating surgery to his right hand.
Prestige, as is true with many companies in the construction industry, was apparently unconcerned with plaintiffs’ alien status, complying with the federal Immigration Reform and Control Act of 1986 (8 USC § 1324a et seq. [IRCA] [which requires that before an employer hire an alien, it verify the prospective worker’s identity and work eligibility by examining the government-issued documentation]), or IRS regulations. Indeed, in their deposition testimony, both Gomez and Livicura testified that they did not have to fill out an application to work for Prestige, or show any type of identification, and they were not asked for a Social Security number, were always paid in cash, and were never given W-2 forms. (Defendants’ exhibit F at 22-23, 27, 71; defendants’ exhibit G at 14, 16-17, 56, 68.)
In addition to not complying with hiring regulations, Prestige apparently was not very concerned with the safety of its employees either. According to Tony Crozzoli, the owner of *869 Diamond Point Excavation, Prestige did not have a safety director at the site (having fired the safety director sometime before the accident). (Plaintiffs’ exhibit D at 74-76.) In addition, plaintiffs were initially not provided with hard hats when they began their employment, nor were they provided with harnesses on the date of the accident even though Gomez was using a jackhammer on what was left of the concrete floor while Livicura used wire cutters. The remaining portion of the floor was approximately eight feet by four feet and was in between beams that supported the floor. The concrete slab was standing as an island, supported by beams on four sides. When plaintiffs reached the slab by walking 10 feet on exposed beams, three sides of the slab had already been cut and separated from the supporting beams. Thus when the slab suddenly tipped, plaintiffs fell to the floor below without any protection whatsoever. (Defendants’ exhibit F at 34-57; defendants’ exhibit G at 27-41.)
Now that plaintiffs are injured and seeking lost wages, the owner and general contractor are suddenly concerned with plaintiffs’ alien status and income tax returns.
Analysis
Although a worker’s alien status may be a legitimate factor in litigating a lost wage claim (Balbuena v IDR Realty LLC, 6 NY3d 338, 362 [2006]), in the facts of this case, allowing defendants to inquire of plaintiffs’ status would contravene the legislative policies behind the IRCA. It would also unnecessarily intimidate plaintiffs from pursuing a legitimate claim. Accordingly, defendants’ motion is denied.
Recognizing that employers often hire undocumented workers to keep cost down and that this practice was inconsistent with our immigration policies, Congress enacted the IRCA with the expressly stated aim of curbing this practice. (See IRCA, 8 USC § 1324a et seq., as added by Pub L 99-603, 100 US Stat 3359, as amended.) As the Court of Appeals noted in Balbuena v IDR Realty LLC (6 NY3d 338, 353-354 [2006], supra),
“Both Congress and the President expressed the view that ‘[t]he principal means of closing the back door, or curtailing future illegal immigration, [wa]s through employer sanctions’ (HR Rep No. 99-682, part I, 99th Cong, 2d Sess, at 46, reprinted in 1986 US Code Cong & Admin News, at 5650) that were intended to ‘remove the incentive for illegal immigration by eliminating the job opportunities *870 which draw illegal aliens’ into the country (Pub L 99-603, Statement by President Ronald Reagan Upon Signing S 1200, 22 Wkly Compilation Presidential Docs 1534 [Nov. 10, 1986], reprinted in 1986 US Code Cong & Admin News, at 5856-1). To attain this goal, the most important component of the IRCA scheme was the creation of a new ‘Employment verification system’ designed to deter the employment of aliens who are not lawfully present in the United States and those who are lawfully present, but not authorized to work (see 8 USC § 1324a [b]).
“Under this system, aliens legally present and approved to work in the United States are issued formal documentation of their eligibility status by federal immigration authorities (see 8 USC § 1324a [b] [1] [B], [C]), usually in the form of a ‘green card,’ a registration number or some other document issued by the Bureau of Citizenship and Immigration Services (see INS v National Center for Immigrants’ Rights, Inc., 502 US 183, 195-196 [1991]; 8 CFR 274a. 12 [a]). Before hiring an alien, an employer is required to verify the prospective worker’s identity and work eligibility by examining the government-issued documentation. If the required documentation is not presented, the alien cannot be hired (see 8 USC § 1324a [a] [1]). An employer who knowingly violates the employment verification requirements, or who unknowingly hires an illegal alien but subsequently learns that an alien is not authorized to work and does not immediately terminate the employment relationship, is subject to civil or criminal prosecution and penalties (see 8 USC § 1324a [a] [1], [2]; [f] [1]).
“In addition to the provisions relating to the responsibilities of employers, IRCA also declares that it is a crime for an alien to provide a potential employer with documents falsely acknowledging receipt of governmental approval of the alien’s eligibility for employment (see 8 USC § 1324c [a]). Similar to the [Immigration and Naturalization Act], however, IRCA does not penalize an alien for attaining employment without having proper work authorization, unless the alien engages in fraud, such as presenting false documentation to secure the employment. In order to preserve the national *871 uniformity of this verification system and the sanctions imposed for violations, Congress expressly provided that IRCA would ‘preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens’ (8 USC § 1324a [h] [2]).”
In short, under IRCA, the onus is on the employer to make sure that it is hiring a person authorized to work and its failure to do so will expose it to civil or criminal prosecution and penalties. Only in situations, unlike the present case, where the worker uses false documents to obtain employment, will he be subject to criminal penalties.
Notwithstanding an employer’s exposure to certain risks under IRCA, in certain industries, such as in the demolition segment of the construction industry, that risk is insufficiently high to deter the hiring of undocumented immigrants. (See Brian Kates, Building Boom-Doggle, At the Mercy of Contractors, Daily News, May 29, 2007, at 9, col 1.) Thus, certain segments of the construction industry are replete with undocumented aliens. (See Developments in the Law — Jobs and Borders, Legal Protections for Illegal Workers, 118 Harv L Rev 2224, 2224 n 4 [Department of Labor and Immigration and Naturalization Service studies find that 39% of certain construction workers were undocumented].) Given the status of the industry, it seems somewhat disingenuous for contractors and owners to seek disclosure of the status of an employee after the employee has been injured under the guise of attempting to mitigate a lost wage claim, a concern which apparently never entered their minds when the work was bid out. Indeed, in the present case, F & T could have instructed its general contractor not to subcontract with outfits who did not comply with federal regulations, and Top 8 could have insisted that all its subcontractors comply with federal regulations as well.
Relying on Balbuena v IDR Realty LLC (supra, 6 NY3d at 338), F & T and Top 8 move for an order compelling further depositions of plaintiffs with regard to immigration status and income tax returns. In Balbuena, the Court of Appeals addressed whether an undocumented alien injured at a work site as a result of state Labor Law violations is precluded from recovering lost wages due to immigration status. A split in authority had developed between the Appellate Division, First and Second Departments, on this issue given the Departments’ interpretation of Hoffman Plastic Compounds, Inc. v NLRB (535 US 137 *872 [2002]), which held that an undocumented alien who provided fraudulent work papers in violation of federal law could not be awarded back pay for work not performed as a result of an employer’s unfair labor practice. (Compare Balbuena v IDR Realty LLC, 13 AD3d 285 [1st Dept 2004] [an alien who has not obtained work authorization is precluded by Hoffman from claiming lost wages derived from income earned in the United States, but may seek wages based on income that could be earned in the alien’s home country], with Majlinger v Cassino Contr. Corp., 25 AD3d 14 [2d Dept 2005] [state tort law is not preempted by federal immigration law because neither federal statutes nor Hoffman prohibit an undocumented alien from recovering lost wages in a personal injury action].)
After an exhaustive analysis of federal law, New York State Labor Law, and preemption principles, the Court of Appeals held in Balbuena that “IRCA does not bar maintenance of a claim for lost wages by an undocumented alien” “in the absence of proof that plaintiffs tendered false work authorization documents to obtain employment” (6 NY3d at 363).
In addressing mitigation concerns, the Court first noted that, where a plaintiff has suffered serious injuries which prevent him from working (such as Gomez in the present case), there is no need for plaintiff to mitigate and, therefore, his immigration status is irrelevant. (Id. at 361.) It went on to state that:
“In any event, any conflict with IRCA’s purposes that may arise from permitting an alien’s lost wage claim to proceed to trial can be alleviated by permitting a jury to consider immigration status as one factor in its determination of the damages, if any, warranted under the Labor Law (see e.g. Madeira v Affordable Hous. Found. Inc., 315 F Supp 2d at 507-508). An undocumented alien plaintiff could, for example, introduce proof that he had subsequently received or was in the process of obtaining the authorization documents required by IRCA and, consequently, would likely be authorized to obtain future employment in the United States. Conversely, a defendant in a Labor Law action could, for example, allege that a future wage award is not appropriate because work authorization has not been sought or approval was sought but denied. In other words, a jury’s analysis of a future wage claim proffered by an undocumented alien is similar to a claim asserted by any other injured person in that the de *873 termination must be based, on all of the relevant facts and circumstances presented in the case.” (Id. at 362.)
Here, there is no indication that plaintiffs used false documents to obtain employment with Prestige. In fact, their deposition testimony indicates that Prestige required no documentation whatsoever. Prestige’s qualification was simply a willingness to do dangerous work. Accordingly, pursuant to Balbuena, plaintiffs may pursue a lost wage claim. Furthermore, since Gomez’ injuries prevent him from working in the future, there is no need for him to establish that he obtained or was in the process of obtaining work authorization. (Id. at 362.) Accordingly, Gomez’ alien status is irrelevant and defendants may not question him on that matter.
Although F & T and Top 8 could theoretically argue with respect to Livicura that a future wage award based on United States wages is inappropriate assuming he has not sought work authorization or approval was sought but denied, this court will not allow defendants to question Livicura on his status in this case for several reasons. First, it appears that Prestige intentionally violated IRCA by not ascertaining its employees’ authorization to work in the United States to enlist a cheaper workforce. Second, and even more importantly, mitigation encompasses an employer proving that the injured employee cannot obtain employment in New York or the USA, but only in his country of origin. The fallacy of this mitigation argument, however, is that the construction industry, especially that sector that does demolition, would reemploy Livicura without hesitation because of the very fact that he is undocumented and the employer may feel that it can pay less and not accord him the protection of the labor laws.
In addition, to permit F & T and Top 8 to ascertain Livicura’s work authorization after a lost earnings claim is interposed is tantamount to encouraging employers such as Prestige (as well as defendants for turning a blind eye at Prestige’s hiring practices) to thwart IRCA’s legislative policy with impunity. Indeed, what is really happening under the guise of litigating lost wages is that undocumented workers are being intimidated with the prospect of being deported and having their families and lives torn apart after providing their services for dangerous work. Thus, Prestige (as well as those sectors of the construction industry that rely on undocumented workers) could undermine immigration policy on the one hand, while undocumented work *874 ers are being threatened, with the possibility of deportation if they get hurt on the job. In short, it is a win-win situation for the construction industry while the undocumented worker bears all the risk. This court will not condone this behavior whether intimidation is the intended result or simply an unfortunate byproduct of litigating a legitimate concern. (See Legal Protection for Illegal Workers, supra, 118 Harv L Rev at 2233-2234 [“(w)hen courts determine that immigration status is relevant to an aspect of a claim, defense attorneys, defendants, and potential defendants can turn worker-protection claims into deportation threats”].) If defendants can somehow demonstrate that the demolition industry has all of a sudden agreed to abide by IRCA such that Livicura could not obtain demolition work without proper authorization, the court might reconsider its ruling. But, we all know better.
Accordingly, based on the foregoing, it is hereby ordered that the instant motion is denied in its entirety.
[Portions of opinion omitted for purposes of publication.]